UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. _____ – Civ _____

UNITED STATES OF AMERICA,
STATE OF FLORIDA, and *ex rel.*
BEATRIZ MORALES,

**Case No: 17–80871–CIV–MARRA/MATTHEWMAN**

FILED ___ D.C.

JUL 21 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

     Plaintiffs,

v.

**Filed Under Seal Pursuant 31 U.S.C. 3730(b)(2) Do Not Place In Press Box or Enter on Publicly Accessible System**

HABANA HOSPITAL PHARMACY,
INC., a Florida corporation;
LONGEVITY, LLC, a Florida Limited
Liability Company; FOREST HILL
PHARMACY, LLC, Florida Limited
Liability Company; THE PHARMACY
GRID, LLC, a Florida Limited Liability
Company; and G&K PHARMACY, LLC,
a Vermont Limited Liability Company,

     Defendants.

_____/

**FALSE CLAIMS ACT COMPLAINT
AND DEMAND FOR JURY TRIAL**

Relator, BEATRIZ MORALES (hereinafter "Relator") brings this action on behalf of the

United States of America, the State of Florida against Defendants, HABANA HOSPITAL

PHARMACY, INC., a Florida corporation; LONGEVITY DRUGS, LLC, a Florida Limited

Liability Company; FOREST HILL PHARMACY, LLC, Florida Limited Liability Company;

THE PHARMACY GRID, LLC, a Florida Limited Liability Company; and G&K PHARMACY,

1

LLC, a Vermont Limited Liability Company, (hereinafter collectively referred to as "Defendants") and alleges based upon their own direct and independent knowledge, as follows:

## I.    ALLEGATIONS

1. This is an action to recover damages and civil penalties on behalf the United States of America, arising from false and/or fraudulent records, statements, and claims made, used and caused to be made, used, or presented by Defendants and/or their agents, predecessors, successors, and employees in violation of the under the False Claims Act, 31 U.S.C. §§3729 - 3733, and under the common law theories of unjust enrichment and payment by mistake.

2. As required by the False Claims Act, 31 U.S.C. §3730(b)(2), before the filing of this action, the Relator has provided to the Attorney General of the United States and to the United States Attorney for the Southern District of Florida, a disclosure statement of all material evidence and information related to the complaint.  The disclosure statement is supported by material evidence known to the Relators to establish the existence of Defendants' false claims. Because the disclosure statement includes attorney-client communications and work-product of Relators' attorney, and is submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in the litigation, the Relator understands this disclosure to be confidential.

3. This action seeks damages and civil penalties in connection with a scheme entered into by the Defendants that resulted in the federal government paying over $17 million to Defendants for false or fraudulent prescriptions submitted by Defendants to Medicare, Medicaid, and Tricare (hereinafter "government healthcare programs") for prescriptions that were: (a.) invalid ; (b) if provided, was not medically necessary; or (c) was affected by kickback and

other unlawful financial arrangements, fraudulent signatures of physicians and pharmacists, and altered documents.

4.   The facts and circumstances alleged hereinafter involve a deceitful and systematic scheme which resulted in the fleecing of government healthcare programs, by (a) submitting requests for payment to government healthcare programs without the presence of a valid prescription; (b) allowing individuals that are not licensed as pharmacists or physicians to unlawfully alter prescription formulas; (c) allowing individuals not licensed as a pharmacists to knowingly write compound prescriptions for against state law; (d)  allowing and encouraging unlawful transactions to continue by pharm techs, such as refilling prescriptions without a prescription (fraudulent or valid) and re-writing formulas without knowledge of the physicians or licensed pharmacist; (e) encouraging pharmacists to re-write compound prescriptions to identify a prescription that would be covered by government healthcare programs despite the expiration of multiple Collaborative Pharmacist Agreements or lack of any valid Collaborative Pharmacist Agreement authorizing a change in the prescription or ; (g) unlawfully waiving co-pays for prescriptions paid to government healthcare programs; (f) submitting claims for payment multiple times under false prescriptions numbers to identify a formula/prescription that would be paid by the government healthcare programs' insurance; and (g) effecting by kickback and other unlawful financial arrangements, and fraudulent prescriptions not approved or written by pharmacists.

## II.   THE PARTIES

5.   Relator, Beatriz Morales, is a resident of Hillsborough County, Florida, with a home address of 3411 West Louisiana Avenue, Tampa, FL 33614.

6.  Relator is a duly licensed pharmacist under the laws of Florida with 40 years of experience within the field of pharmacy, and has been a licensed pharmacist in the State of Florida since 1991 (License No. PS25891).  Additionally, Relator has been a licensed Healthcare Risk Manager, (License No. 5504219) since 2009 which involves assessing the risk to patient safety, and has also been a Consultant Pharmacist (License No. PS5614) since 2002.

7.  Relator was employed by the Defendant, Habana Hospital Pharmacy, as the Pharmacist in Charge at Habana Hospital Pharmacy, Inc., from August 15, 2015 to March 15, 2016.

8.  Relator brings this action based on her direct knowledge and also on information and belief and experience with various types of illegal actions and activities of Defendants concerning prescription re-writing, submission of claims for payment with no valid prescriptions, re-writing of prescriptions for controlled and non-controlled compounds, waiver of required co-pays by federal regulation, at least one occurrence of a kickback scheme with a physician, failure of Defendants to provide requests for payments to the government healthcare programs at the best price, and Defendants' practice in transferring prescriptions of patients covered by Tricare to other pharmacies owned and operated by the same principal managers and officers of the Defendants after Habana Hospital Pharmacy, Inc. was no longer authorized to process Tricare prescriptions. None of the actionable allegations set forth in this Complaint are based on public disclosure as set forth in 31 U.S.C. §3730(e)(4). Notwithstanding the same, Relator is an original source of the facts alleged in this Complaint.

9.  At all times relevant hereto, Defendants acted through their agents and employees and the acts of Defendants' agents and employees were within the scope of their agency and employment. The policies and practices alleged in this complaint were, on information and belief, set or ratified at the highest corporate and management levels of Defendants.

4

10. Defendant, HABANA HOSPITAL PHARMACY, INC. (Hereinafter "Habana") is a Florida corporation formed on February 23, 1970. Habana maintains its principal place of business at 4710 N. Habana Ave, Suite 101, Tampa, FL 33614. The principal owners of Habana are Steven R. Medendorp, Terrence Myers, Clayton Hummel, and Ryan Goodkin. Habana was incorporated to provide compound pharmacy services to citizens in Florida, and has engaged in that business since at least 1970. **(See, Exhibit 26).**

11. Defendant, LONGEVITY, LLC, (Hereinafter "Longevity") is a Florida limited liability company formed on February 5, 2015. Longevity maintains its principal place of business at 101 N. Federal Highway, Lake Worth, FL 33460. The principal managers of Longevity are Ryan Goodkin and Terrence Myers. Longevity was incorporated to provide compound pharmacy services to citizens in Florida, and has engaged in that business since at least 2015. *Id.*

12. Defendant, FOREST HILL PHARMACY, LLC, (Hereinafter "Forest Hill") is a Florida limited liability company formed on August 17, 2015.  Forest Hill maintains its principal place of business at 2939 Forest Hill Boulevard, West Palm Beach, FL 33406. The principal managers of Forest Hill are Ryan Goodkin and Terrence Myers, Jr. Forest Hill was incorporated to provide compound pharmacy services to citizens in Florida, and has engaged in that business since at least 2015. *Id.*

13. Defendant, THE PHARMACY GRID, LLC, (Hereinafter "Pharmacy Grid") is a Florida limited liability company formed on June 3, 2015. Pharmacy Grid maintains its principal place of business at 120 N. Federal Highway, Suite 306, Lake Worth, FL 33460.  The principal managers of The Pharmacy Grid, LLC are John D. Wiley, Ryan Goodkin, and

Terrence Myers, Jr. Pharmacy Grid was incorporated to provide perform management services to citizens in Florida, and has engaged in that business since at least 2015. *Id.*

14. Defendant, G&K PHARMACY, LLC (Hereinafter "G&K") is a Vermont limited liability company formed on November 22, 2015. G&K maintains its principal place of business at 468 Broadway, Allentown, PA 18104. The principal managers of G&K are Daniel Lansman, Ryan Goodkin, Santo Leo, and Terrence Myers. G&K was incorporated to provide compound pharmacy services to citizens in Florida and Vermont, and has engaged in that business since at least 2015. *Id.*

### III.        JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to the False Claims Act, 31 U.S.C. §3732, and under 28 U.S.C. §§1331 and 1345.

16. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. §3732(a) because Defendants own and operate a business in this district and/or has engaged in actionable conduct within this district.

17. Venue is proper in this district pursuant to 28 U.S.C. §3732(a) and 28 U.S.C. §§1391(b)(1) and (2).

18. This action arises under the False Claims Act, the Anti-Kickback Statute, and the Stark Law. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1345; and 31 U.S.C. § 3732(a).

19. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the acts proscribed by 31 U.S.C. § 3729 and complained of herein took place at a business located in the Southern District of Florida, and is also proper pursuant to 28 U.S.C. § 1391(b) and (c)

because at all relevant times Defendants operated their businesses in the Southern District of Florida.

## IV.     STATUTE OF LIMITATIONS

20. The claims in this matter relate back to the filing of the *qui tam* complaint and are timely under 31 U.S.C. §3731(b)(1).

## V.     APPLICABLE LAW

### A.   THE FALSE CLAIMS ACT

21. The False Claims Act makes subject to legal action any person who knowingly presents or causes to be presented false or fraudulent claims for payment or approval to the United States. 31 U.S.C. §3729(a)(1) (through May 19, 2009), §3729(a)(1)(A) (after May 19, 2009, see section 4 of the Fraud Enforcement and Recovery Act of 2009, Pub. L. 111-21).

22. The False Claims Act also makes subject to suit any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. §3729(a)(1)(B).

23. The term "knowingly" under the False Claims Act means that a person, with respect to information, (i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information, (iii) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. §3729(b)(1).  No proof of specific intent to defraud is required to show a person acted knowingly under the Act. 31 U.S.C. §3729(b).

24. The False Claims Act provides for recovery of three times the damages sustained by the United States ("treble damages") plus a civil penalty for each false claim presented or caused

to be presented.  This penalty is to be not less than $5,500 and not more than $11,000. 31

U.S.C. §3729(a), as amended by the Federal Civil Penalties Inflation Adjustment Act of

1990, and the Debt Collection Improvement Act of 1996, see 28 U.S.C. §2461 (notes), and

64 Fed. Reg. 47099, 47103 (1999).

25. Federal law prohibits knowingly presenting or causing to be presented a false or fraudulent

claim for payment from the United States Government. It is unlawful to conspire to defraud

the Government by getting a false or fraudulent claim allowed or paid.

26. The Act, at § 3729, provides in pertinent part that:

> (a)     Any person who (1) knowingly presents, or causes to be
> presented to an officer or employee of the United States
> Government or a member of the Armed Forces of the United States
> a false or fraudulent claim for payment or approval; (2) knowingly
> makes, uses, or causes to be made or used, a false record or
> statement to get a false or fraudulent claim paid or approved by the
> Government; (3) conspires to defraud the Government by getting a
> false or fraudulent claim paid or approved by the Government; ...
> or (4) knowingly makes, uses, or causes to be made or used, a false
> record or statement to conceal, avoid, or decrease an obligation to
> pay or transmit money or property to the Government,. . . is liable
> to the United States Government for a civil penalty of not less than
> $5,500 and not more than $11,000, plus 3 times amount of
> damages which the Government sustains because of the act of that
> person . . .
> (b)     For purposes of this section, the terms "knowing" and
> "knowingly" mean that a person without respect to information (1)
> had actual knowledge of the information; (2) acts in deliberate
> ignorance of the truth or falsity of the information; or (3) acts in
> reckless disregard of the truth or falsity of the information, and no
> proof of specific intent to defraud is required. 31 U.S.C. §3729.

27. On May 20, 2009, Congress enacted the Fraud Enforcement and Recovery Act ("FERA"),

which amended 31 U.S.C. § 3729(a)(1) and (a)(2), which became § 3729(a)(1)(A) and

(a)(1)(B), respectively. After the FERA amendments, § 3729(a)(1) currently provides

liability for any person who:

knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); § 3729(a)(1).

28. Under the FERA amendments, liability under § 3729(a)(1)(A) or (C) applies to all conduct by the Defendants that occurred after the date of the FERA enactment, May 20, 2009. For liability for false claims under § 3729(a)(1)(B), FERA provides that this provision applies retroactively to all false claims made by Defendants which were pending on or after the date of June 7, 2008.

**B.   THE ANTI-KICKBACK STATUTE, 42 U.S.C. 1320A-7B(B)**

29. The kickback prohibition applies to all sources of referrals, even patients. For example, where the Medicare and Medicaid programs require patients to pay copays for services, you are generally required to collect that money from your patients. Routinely waiving these copays could implicate the Anti-Kickback Statute, and you may not advertise that you will forgive copayments. However, you are free to waive a copayment if you make an individual determination that the patient cannot afford to pay or if your reasonable collection efforts fail.

30. Any payments to a pharmacy that is a Medicare Part D entity under the Medicare Part D program are conditioned on a certification by the pharmacy, and the Pharmacy Benefits Manager and Plan D Sponsor contracting with the pharmacy, that it has not paid kickbacks to a physician or any other person to obtain patient referrals to the pharmacy to process the physicians' prescriptions.  Any home health agency bills to Medicare that are infected by such kickbacks are false and therefore actionable under the False Claims Act.  See 42 U.S.C. §1320a-7b(g) (incorporating False Claims Act amendment clarifying that "a claim that

includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act].")

31. All individuals and entities enrolling in Medicare must certify that they are aware that any payment to them is conditioned upon the claims complying with the Anti-Kickback Statute.

32. The Anti-Kickback Statute prohibits any person or entity from offering, making, or accepting anything of value to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made in whole or in part by a federal health care program.  It similarly prohibits any person or entity from soliciting anything of value for such referrals.

33. The prohibition on kickbacks is based on evidence that providing things of value to those who can influence healthcare decisions will corrupt professional healthcare decision-making and result in federal funds being diverted to pay for goods and services that are medically unnecessary, of poor quality, and/or harmful.

34. The Anti-Kickback statute prohibits the payment of remuneration by a pharmacy or Medicare Part D entity to a physician, or employee, that has, as one of its purposes, inducement of the physician's referrals of individuals to the pharmacy or inducement of prescriptions or drugs by the physician that individuals have a need for prescriptions.

35. The prohibition on kickbacks is based on evidence that providing things of value to those who can influence healthcare decision will corrupt professional healthcare decision-making and result in federal funds being diverted to pay for goods and services that are medically unnecessary, of poor quality, and/or harmful.

## C. THE STARK LAW

36. The Stark Law prohibits pharmacies from submitting Medicare claims that are the product of patient referrals from physicians with whom an agency has an impermissible financial relationship.  42 U.S.C. §1395, *see* 42 U.S.C. §§1395(h)(6)(I) (applying law to home health claims).

37. A financial relationship that is impermissible is defined as a "compensation arrangement". 42 U.S.C. §1395(a)(1) & (2).

38. A "compensation arrangement" is defined as "any arrangement involving any remuneration between a physician ... and an entity." 42 U.S.C. §1395(h)(1)(A).

39. If an impermissible financial relationship exists, then "(A) the physician may not make a referral to the entity for the furnishing of designated health services ... and (B)  the entity may not present or cause to be presented a claim . . . for designated health services furnished pursuant to a referral prohibited under subparagraph (A)."  42 U.S.C. §1395(a)(1).

40. Congress enacted the Stark Law because it found that financial relationships between physicians and entities to which they refer patients would compromise the physicians' professional judgment as to whether an item or service is medically necessary, safe, effective, and of good quality.  Congress relied upon academic studies showing that physicians who had financial relationships with entities to which they referred used more of those entities' services than similarly situated physicians who did not have such relationships.  The Stark Law was designed to protect the taxpayer from paying for the costs of questionable utilization of services by removing monetary influences on referral decisions.

41. Compounding has been defined by the United States Supreme Court as: "…a process by which a pharmacist or doctor combines, mixes, or alters ingredients to create a medication tailored to the needs of an individual patient." *Thompson v. Western States Medical Center*, 535 U.S. 357, 361 (2002).

42. The Stark Law requires that the Medicare program deny payment for claims for any services billed in violation of its provisions.  42 U.S.C. §1395nn(g).  In addition, it requires that providers who have collected Medicare payments for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis."  42 C.F.R. §411.353.

43. All individuals and entities enrolling in Medicare must certify that they are aware that any payment to them is conditioned upon the claims being in compliance with the Stark Law.

44. All claims for payment submitted knowingly that are infected by violations of the Stark Law are actionable under the False Claims Act.

**D.   MEDICARE PROGRAM REQUIREMENTS AND LEGAL BACKGROUND**

**MEDICARE PROGRAM**

45. The Medicare Program is the federal health insurance program for the aged and disabled, 42 U.S.C. §1395, and is administered by the Centers for Medicare and Medicaid Services, a component of the U.S. Department of Health and Human Services.  Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries."

46. Federal law requires "any health care practitioner . . . who provides health care services for which payment may be made . . . to assure, to the extent of his authority that services or items ordered or provided by such practitioner . . . be provided economically and only when,

and to the extent, medically necessary.  42 U.S.C. §1320c-5(a)(1).  The quality of such care must "meet professionally recognized standards of health care."  42 U.S.C. §1320c-5(a)(2).

47. "[C]ompliance with federal health care laws . . . is a condition of payment by the Medicare program."  _McNutt ex rel. United States v. Haleyville Medical Supplies, Inc_., 423 F.3d 1256, 1259 (11th Cir. 2005).

48. Claims submitted to the Medicare and Medicaid programs for care, which do not meet professionally recognized standards of health care, are false and fraudulent claims under the False Claims Act.  _See United States ex rel. Aranda v. Community Psychiatric Centers of Oklahoma, Inc.,_ 945 F.Supp. 1485, 1488 (W.D. Okla. 1996); _United States v. NEC Healthcare Corp.,_ 115 F. Supp.2d 1149, 1156 (W.D. Mo. 2000).

49. "Submitting a claim [under the Medicare or Medicaid programs] under the false pretense of entitlement is fraudulent."  _United States ex rel. Kneepkins v. Gambro Healthcare, Inc_., 115 F.Supp.2d 35, 43 (D. Mass. 2000).

50. Medicare has four primary components:   Part A--hospital insurance; Part B—medical insurance; Part C—Medicare Advantage managed care; and Part D—prescription drugs.

51. Only individuals and entities that have signed the required certifications concerning compliance with the requirements of the Medicare program, and are thereafter approved for participation, are assigned billing numbers and permitted to bill Medicare (these billing numbers are known as "Provider Identification Numbers," "CMS Certification Numbers" or "OSCAR numbers").

52. When such an individual or entity renders a service, it submits a claim for reimbursement that includes the individual or entity's billing number, the identification number for the patient (known as a "HICN"), and a code for the service rendered.

53. Persons and entities may submit claims to Medicare only for services they actually rendered, which must be medically necessary, and they must maintain the medical records showing that they rendered the service and that the service was medically justified.

## MEDICARE PART D

54. The Medicare Part D Program provides beneficiaries with assistance in paying for out-patient prescription drugs. This vast out-patient prescription drug benefit was added to Medicare by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, ("MMA"), Pub. L. 108-173 (Dec. 8, 2003), 42 U.S.C. § 1395w-101 et seq. (2004 supplement), 42 C.F.R. § 423.506.

55. The MMA provides that Medicare beneficiaries entitled to Medicare benefits under Part A or enrolled in Part B are eligible for Medicare Drug benefits under Part D. Section 1860D-2 of the Social Security Act, 42 U.S.C. 1395w-102, provides for out-patient prescription drugs to be provided to Medicare beneficiaries to be called "Medicare Part D" benefits which began in January 2006.

56. If a drug, as prescribed and dispensed or administered to an individual, is covered for that individual under Medicare Part A or Part B, then the drug is not covered under Part D. 42 U.S.C. § 1396w-102(e)(2)(B), Section 1860D-2(e)(2)(B) of the Social Security Act. 18

57. The MMA also created a subsidy available to certain employer, union, and other group Plans that provide retiree coverage to Part D eligible individuals that is at least equivalent to Part D

coverage (the "retiree drug subsidy"). Section 1860D-22 of the Social Security Act, 42 U.S.C. § 1395w-132. Thus, the Federal government pays a Part D retirement subsidy to employers whose Plans provide prescription drug benefits similar to Part D Plans for their retired employees.

58. Unlike coverage in Medicare Parts A and B, Part D coverage is not provided within the traditional Medicare program. Instead, Medicare beneficiaries must affirmatively enroll in one of many hundreds of Part D Plans offered by private companies such as the Caremark Defendants. See, MMA, Sections 1102, 1860D-1 through 1860D-42, and 1871 of the Social Security Act; 42 U.S.C. §§ 1302, 1395w-101 through 1395w-152, and 1395hh.

59. A Medicare Part D Plan Sponsor ("Part D Sponsor"), whether it be a Part D Plan (PDP), or a Medicare Advantage Prescription Drug Plan (MA-PD), is an entity that is certified as meeting the requirements of Part D and that contracted with CMS to provide Part D benefits. Section 1860D-41, 42 U.S.C. § 1395w-151(a)(13) and (14)(B). The term "Part D Sponsor" also includes employer and union-sponsored plans which offer qualified Part D prescription coverage. 42 C.F.R. § 423.504(b). CMS is authorized to deny an application to qualify as a Part D Sponsor based on the applicant's failure to comply with the terms of a previous year's contract with CMS, even if the applicant is currently meeting all of the requirements for Part D participation. 42 C.F.R. 423.503(b).

**ENTITIES OPERATING IN THE MEDICARE PART D SYSTEM**

    1. **Part D Sponsor**

60. The Part D Plan Sponsor must also agree to comply with the requirements and standards of Part D and all the terms and conditions of payment. Section 1860D-12, 42 U.S.C. § 1395w-112(b)(1).

61. The contract between the Part D Plan Sponsor and CMS must include the elements listed in 42 C.F.R. § 423.505(b), including compliance with the reporting requirements as set forth in § 423.514 and the requirements set forth in § 423.329(b) for submitting drug claims and related information to CMS for its use in risk adjustment calculations. The Part D Plan Sponsor must also expressly agree to provide CMS with the information CMS determines is necessary to carry out payment provisions. 42 C.F.R. § 423.505(b)(8) and (9).

62. A Part D Plan Sponsor, in contracting with CMS, also expressly "agrees to comply with Federal laws and regulations designed to prevent fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law [and] the False Claims Act (32 U.S.C. §§ 3729 et seq.)." 42 C.F.R. 423.505(h)(1).

63. To qualify for Part D payments from CMS, before each plan year, each approved Part D Plan Sponsor must submit a bid, certified by an actuary, for each Part D Plan it will offer. 42 C.F.R. § 423.265. The bid contains a per member per month ("PMPM") cost estimate to provide Part D benefits to an average Medicare beneficiary in a particular geographic area. CMS considers both the tiered formulary structure and utilization management program components of the Part D Plan Sponsor's bid. 42 C.F.R. § 423.272(a)(2). From those Part D Plan bids, CMS calculates nationwide and regional benchmarks which represent an average PMPM cost. If the Part D Plan Sponsor's bid exceeds the benchmark, the Plan Member must pay the difference.

64. Once approved, the Part D Plan Sponsor may market its Plans to eligible Medicare Part D beneficiaries, but CMS sets restrictions on marketing and enrollment. 42 C.F.R. § 423.50.

65. During each benefit year, CMS pays the Part D Plan Sponsors estimated payments on a monthly basis. In turn, Part D Plan Sponsors provide CMS with documentation of their actual

costs. One required method for Part D Plan Sponsors to provide actual cost information to CMS is by submitting a Prescription Drug Event ("PDE") record for every prescription that is filled for a Plan Member.

66. Once enrolled, each Part D Plan participant pays a monthly premium to the Part D Plan, as determined under the Part D Regulations. 42 C.F.R. §§ 423.153 and 423.293.

67. In the year following each benefit year, CMS reconciles a PDP Sponsor's actual prescription drug costs as derived from its PDE records against the Sponsor's bid. If a PDP sponsor's actual costs exceed the estimated costs, the Sponsor may be able to recoup some of its losses through a risk-sharing arrangement with CMS. Conversely, if a Part D Plan Sponsor's estimated costs exceed its actual costs, the Sponsor may have to pay back some of its estimated payments to CMS.

68. Thus, CMS pays the Part D Sponsor under Medicare Part D. The Part D Sponsor then pays the Part D Plan pharmacies for prescriptions, less the Medicare beneficiary's co-pay.

69. The Part D Sponsor is required to make several significant and material express certifications to CMS regarding its submission of Part D data used for payment:

> 1. Certification of Data that Determines Payment: "As a condition for receiving a monthly payment … the Part D Plan sponsor agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must request payment under the contract on a document that certifies (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of all data related to payment. The data may include specified enrollment information, claims data, bid submission data, and other data that CMS specifies." 42 C.F.R. § 423.505(k)(1).
>
> 2. Certification of Enrollment and Payment Information: "The CEO, CFO, or an individual delegated the authority to sign on

behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information, and belief) that each enrollee for whom the organization is requesting payment is validly enrolled in a program offered by the organization and the information CMS relies on in determining payment is accurate, complete, and truthful and acknowledge that this information will be used for the purposes of obtaining Federal reimbursement." 42 C.F.R. § 423.505(k)(2).

3. Part D Sponsor Certification of Claims Data: "The CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information, and belief) that the claims data it submits under § 423.329(b)(3) (or for fallback entities, under § 423.871(f)) are accurate, complete, and truthful and acknowledge that the claims data will be used for the purpose of obtaining Federal reimbursement." 42 C.F.R. §423.505(k)(3).

4. Certification of Bid Submission Information. The CEO, CFO, or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information, and belief) that the information in its bid submission and assumptions related to projected reinsurance and low income cost sharing subsidies is accurate, complete, and truthful and fully conforms to the requirements in § 423.265." See, 42 C.F.R. § 423.505(k)(4).

70. The Part D Sponsor is required to expressly certify to the accuracy and completeness of allowable costs for risk corridor and reinsurance information and of data for price comparison that it submits to CMS. 42 C.F.R. § 423.505(k)(5) and (6).

71. Particularly relevant here, the entity submitting the Part D payment data, the Part D Sponsor or PBM, must also make express certifications to CMS regarding Part D data used for payment. The Federal regulations provide that the entity submitting Part D claims data, the Part D Sponsor or the PBM, must execute the following certification:

If the claims data are generated by a related entity, contractor, or subcontractor of a Part D plan sponsor, the entity, contractor, or subcontractor must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and

> truthfulness of the data and acknowledge that the claims data will
> be used for the purposes of obtaining Federal reimbursement."

42 C.F.R. § 423.505(k)(3), (emphasis added).

### 2. First Tier, Downstream and related entities – Pharmacies

72. The regulations governing Part D benefits define major entities with which a Part D Sponsor

may contract. 42 C.F.R. § 423.505(i). See also CMS Prescription Drug Manual Chapter 9 -

Part D Program to Control Fraud, Waste and Abuse, 40 – Part D Sponsor Accountability and

oversight, p. 12. CMS has described these entities as "pharmacies or other providers, related

entities, contractors, subcontractors, first tier and downstream entities."

73. A "First Tier Entity" is a party with whom the Part D Sponsor has a written contract

"acceptable to CMS with a Sponsor or applicant to provide administrative services or health

care services for a Medicare eligible individual under Part D." 42 C.F.R. § 423.501.

74. In most cases, the "First Tier Entity" will be a pharmacy benefits manager, PBM. CMS

Prescription Drug Manual Chapter 9 - Part D Program to Control Fraud, Waste and Abuse,

40 – Part D Sponsor Accountability and oversight, p. 12.

75. A "Downstream Entity" is any entity with a written contract with the Part D Sponsor "below

the level of the arrangement between a Sponsor and a first-tier entity." 42 C.F.R. § 423.501.

Downstream entities include the ultimate service providers of health and administrative

services, i.e., pharmacies and further downstream below the pharmacy, the pharmacist. CMS

Prescription Drug Manual Chapter 9 - Part D Program to Control Fraud, Waste and Abuse,

40 – Part D Sponsor Accountability and oversight, p. 12.

76. By way of simple illustration, the Part D Sponsor enters into a contract with a pharmacy

benefit manager (PBM), and the PBM would be considered the First Tier Entity.  The PBM

then contracts with assorted pharmacies (here, the Habana Defendants and other pharmacy Defendants) to provide the dispensing services. The pharmacies are Downstream Entities. If the pharmacies then contract with pharmacists, the pharmacists would also be Downstream Entities. CMS Prescription Drug Manual Chapter 9 - Part D Program to Control Fraud, Waste and Abuse, 40 – Part D Sponsor Accountability and oversight, p. 12.

77. Again, if a downstream entity, such as a pharmacy, contracts with a Plan D Sponsor or PBM to provide Plan D services, that entity must also making the following acknowledgment and certification:

> If the claims data are generated by a related entity, contractor, or subcontractor of a Part D plan sponsor, the entity, contractor, or subcontractor must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement."

42 C.F.R. § 423.505(k)(3), (emphasis added).

78. A Related Part D entity is "an entity that is related to the Part D Sponsor by common ownership or control and either performs some of the Sponsor's management functions under contract or delegation, furnishes services to Medicare enrollees under oral or written agreements, or certain lease arrangements with the Sponsor. This includes, for example, where a Sponsor is the parent company of its own in-house PBM." 42 C.F.R. § 423.501; CMS Prescription Drug Manual Chapter 9- Part D Program to Control Fraud, Waste and Abuse, 40 – Part D Sponsor Accountability and oversight, p. 13.

**SUMMARY OF THE PART D PROCESS - ADJUDICATING PRESCRIPTIONS**

79. Most Medicare beneficiaries who elect Part D coverage are responsible for certain costs, which may include a monthly premium, an annual deductible, and/or co-pays.

80. After receiving a prescription from his or her doctor, the Part D Plan beneficiary goes to a retail pharmacy, or in the present case, a compound pharmacy, and presents the prescription to the pharmacist, submits a prescription to a mail order pharmacy, or in some cases, as with the current case, the physician sends a compound prescription directly to a compound pharmacy.

81. After the compound pharmacy receives the prescription and beneficiaries' information, and then submits required data elements to the Plan or its PBM to confirm Medicare Part D enrollment and identify co-pays. This typically takes place via real-time data transmissions between the pharmacy and the PBM. In the Defendant pharmacies this action was almost always performed by a pharmacy technician.

82. At this stage in the adjudication process, the pharmacy must also perform pharmacy services, as required by state law. For example, in Florida, pharmacy services include verifying the prescription being prepared, performing checks for allergic reactions and drug interactions, and retaining the prescription on file which identifies the prescriber.

83. Where the Part D Plan Sponsor uses a PBM, the PBM reviews the pharmacy's initial data submission to conduct pre-dispensing/point-of-sale reviews of the Part D claim as required by Federal law and regulations and pursuant to the contract between the Plan Sponsor and the PBM.

84. If the claim for the prescription is not rejected by the Sponsor or PBM, the pharmacy receives payment authorization and co-pay information and dispenses the prescription to the Part D beneficiary. The beneficiary pays the co-pay to the pharmacy and receives the prescription. At the time of the initial data submission, the pharmacy transmits to the Plan Sponsor or PBM certain data elements specified by contract between the pharmacy and the

Plan Sponsor or PBM. These data elements would include, among other things, the beneficiary information, prescriber information, and drug information.

85. Once the PBM or Plan receives that data from the pharmacy, the PBM or Plan Sponsor submits the claim data to CMS via a Prescription Drug Event ("PDE") record. The Part D Plan or its PBM is required to also submit other data to CMS, i.e., enrollment information, bid submission data, costs for risk corridor and reinsurance information, and data for price comparison. 42 C.F.R. 423.505 (k).

86. Part D Sponsors are also required to submit other information to CMS regarding costs of providing Part D coverage, i.e., administrative costs, rebates, and other information.

**CMS PART D PAYMENTS BASED ON PDE CLAIMS DATA SUBMITTED TO CMS – IMPACT OF THE FALSE AND FRAUDULENT PRESCRIPTIONS FROM THE PHARMACY ON THE CMS PART D PAYMENTS**

87. Sections 1860D-15(c) (1)(C) and (d)(2) of the MMA require Sponsors to submit data and information necessary for CMS to carry out payment provisions. For every prescription filled, the Part D Sponsor or its PBM prepares and submits a PDE record to CMS.

88. The PDE record contains prescription drug cost and payment data that enables CMS to make payments to Plans and otherwise administer the Part D benefit.

89. Sections 1860D-14 and 15 of the MMA provide that CMS pay Plans for Part D benefits through subsidies and risk sharing.

90. CMS pays a direct subsidy (a capitated payment) to the Part D Plan (PDP) in the form of advance monthly payments equal to the Part D Plan's standardized bid, risk adjusted for health status as provided in § 423.329(b), minus a monthly beneficiary premium as

determined in § 423.286. 42 C.F.R. § 423.315(b). In other words, CMS pays a monthly sum to the Part D Plan Sponsor for each Part D beneficiary enrolled in the Plan.

91. In addition to the direct subsidy, through low-income subsidies, CMS makes payments to the Part D Plan for premium and cost sharing subsidies on behalf of certain subsidy eligible individuals as provided in § 423.780 and § 423.782. These types of premium and cost sharing subsidies for qualifying low-income individuals are called "Low-Income Cost Sharing Subsidies" (LICS), and are documented and reconciled using PDE data submitted to CMS. CMS "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE)," 4.27.2006, page 41, Section 10.1. In the United States Territories, CMS issues grants in lieu of LICS.

92. Through retroactive adjustments and reconciliations, CMS also reconciles payment year disbursements with updated enrollment and health status data, actual low-income cost-sharing costs and actual allowable reinsurance costs as provided in § 423.343. See 42 C.F.R. § 423.315(f). In other words, CMS reconciles payments received by Part D Plans at the end of the year to determine whether additional funds are due to or from the Part D Plan Sponsor.

93. For private fee-for-service plans (as defined by § 422.4(a)(3)) that offer qualified prescription drug coverage, CMS determines the amount of reinsurance payments to be made to them as provided under § 423.329(c)(3). See 42 C.F.R. § 423.315(g).

94. Thus, throughout the year, CMS makes prospective payments to Part D Sponsors for three subsidies based on the Sponsors' approved bids: (1) the direct subsidy (a monthly capitated payment) designed to cover the Sponsor's cost of providing the benefits; (2) the low income cost-sharing subsidy (the Federal government's portion of cost-sharing payment for certain

low-income beneficiaries); and (3) the reinsurance subsidy (the Federal government's share of drug costs for beneficiaries who have reached catastrophic coverage).

**REQUIRED DATA ELEMENTS FOR PDE RECORDS**

95. On April 27, 2006, CMS issued "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE)", in which CMS identified a set of data elements, Prescription Drug Event ("PDE") data, which are necessary to determine payments to Medicare Part D PDP Sponsors. The Part D Plan must submit a PDE record for each and every dispensing event. "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE)," 4.27.2006, page 9.

96. The PDE record is a summary record that documents the final adjudication of dispensing event by a PBM based upon claims received from pharmacies "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE), 4.27.2006, page 9.

97. There are 37 set data elements in the required data set for all PDE records: 15 elements for the National Council for Prescription Drug Program ("NCPDP") billing transaction, 5 data elements for the NCPDP billing response transaction, and 17 data elements identified by CMS for purposes of administering Part D. "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE)," 4.27.2006, page 9.

98. Most of the Medicare Part D PDE data elements are the same elements developed by the NCPDP, which have been used for decades by PBMs, pharmacies, and other providers when submitting Medicare and Medicaid claims for prescription drugs to CMS for payment. In its "Instructions for Submitting Prescription Drug Event Data," dated 4/27/2006, at page 11, CMS stated: "Most data elements represent existing NCPDP fields where we employ the

same definition and field values that are currently in use per the NCPDP version 5.1 drug claim standard." NCPDP version 5.1 was approved in September of 1999.

99. When CMS identified "Data Elements for PDE Records," it clearly stated, and all parties were on notice, that submission of PDE data is an express condition of payment: "In this section, we list the required data elements that must be submitted on PDE records for payment ... This Section defines each data element and its specific potential use for CMS's payment process." CMS "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE)," 4.27.2006, page 11, Sec. 2.

100.    CMS further described the purpose of the various PDE data elements as follows: "Much of the data, especially dollar fields, will be used primarily for payment. However, some of the other data elements such as pharmacy and prescriber identifiers will be used for validation of the claims as well as for other legislated functions such as quality monitoring, program integrity, and oversight." CMS "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE)," 4.27.2006, pages 5-6, Section 1.4.

101.    CMS provided that the reporting "requirements apply to all Part D Plans." "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE)," 4.27.2006, page 5. Thus, CMS data reporting requirements and instructions apply to all Part D Plans (PDPs), Medicare Advantage Part Plans (MA-PDs), and any other entity providing Part D benefits.

**PART D CLAIMS CERTIFICATION OF TRUTH AND ACCURACY**

102.    Sponsors and their subcontractors, i.e., PBMs, or downstream entities like pharmacies, when submitting Part D PDE data to CMS, must certify that all claims are true and accurate.

CMS Prescription Drug Benefit Manual, Chapter 9 – Part D Program to Control Fraud, Waste, and Abuse, Section 80.1, p.67, citing 42 C.F.R. § 423.505(k)(3).

103.    Thus, CMS's Regulations for the submission of Part D PDE data place the legal risk of submitting invalid Part D claims data squarely with the submitting or generating entity: "CMS requires that any entity that generates [Part D] claims data on behalf of a Sponsor" must both: "certify to CMS the accuracy, completeness, and truthfulness of that data;" and "acknowledge that the data will be used for purposes of obtaining Federal reimbursement." See "Prescription Drug Benefit Manual, Chapter 9 – Part D Program to Control Fraud, Waste, and Abuse," page 16, Section 40-2; citing 42 C.F.R. § 423.505(k)(3)) (emphasis added).

104.    In keeping with the requirements of 42 C.F.R. § 423.505(k)(3) and CMS Prescription Drug Benefit Manual, Chapter 9 – Part D Program to Control Fraud, Waste, and Abuse, Section 80.1, p.67, Sponsors and their subcontractors who submit Part D PDE data to CMS must certify that it is true and accurate.

105.    Since January 2006, this express certification of Part D PDE data has been included in CMS's Electronic Data Interchange (EDI) Agreement (or a similar document). The EDI Agreement must be executed in order for an eligible organization to submit PDE data electronically to CMS. The EDI is executed by Medicare Plans offering Part D prescription drug benefit and/or the Part D PMBs who submit PDE data on behalf of Part D Sponsors. The certification on the Part D EDI Agreement contains the following (or similar) language: "By signing below, the eligible organization certifies that each submission of PDE data pursuant to this Agreement will be accurate and complete to the eligible organization's best knowledge, information and belief."

106.    Defendants, PBMs and Part D Sponsors have made such explicit certifications of PDE data from the establishment of Defendants' business entities to the present based on Defendants submissions of prescriptions for payment, and they continue to make these certifications on an ongoing basis to the Government.

107.    CMS also requires, through the EDI Agreement, that the Part D Sponsor both: "ensure that every electronic entry can be readily associated and identified with an original source document (e.g., an original drug claim) …," and "retain all original source documentation pertaining to any such particular Medicare prescription drug event for a period of at least 10 years after the prescription drug event is received and processed."

108.    The "original source document" for a drug claim results from a pharmacy's valid prescription which is used as the basis for processing a claim for payment to a PBM or Sponsor. Thus, if a valid prescription is not received and processed for a particular Medicare drug event, the original claim cannot be linked to an original source document.

109.    CMS recognizes that the submission of "inaccurate or incomplete prescription drug event (PDE) data" constitutes Part D fraud, waste, or abuse. CMS Prescription Drug Benefit Manual, Chapter 9 – Part D Program to Control Fraud, Waste, and Abuse," page 56.

110.    Moreover, in addition to being legally obligated to submit and certify accurate PDE data in the first instance, Part D Sponsors are also explicitly required to correct all previously submitted PDE data if the data was erroneous when initially submitted. CMS 2007 Part D Reporting Requirements page 4.

111.    Part D Sponsors are required to make PDE data submissions to CMS at the end of the coverage year (or no later than 5 months after the close of the year) including PDE records,

adjustments, and deletions. See, 42 C.F.R. § 423.308. Part D Sponsors also submit cost reports at the end of the year. 42 C.F.R. § 423.343. For 2006, however, CMS collected cost data on LICS via PDE records instead of cost reports. "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE)," 4.27.2006, page 10.

## PHARMACIES SUBMIT PRESCRIBER ID NUMBERS TO THEIR SPONSORS OR PBMS TO REPORT TO CMS

112.    PDE data elements that identify the prescriber are contained in fields 12 and 13 of the electronic PDE record. Field 12 contains the "Prescriber ID Qualifier," the field that indicates the type of identifier used in the Prescriber ID field. Field 13 contains the Prescriber ID itself, meaning the prescriber's own unique identification number, i.e., DEA number. CMS "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE)," 4.27.2006, page 13, Section 2 (emphasis added).

113.    CMS noted the following regarding the required PDE data on physician identification numbers: "CMS requires use of a DEA number whenever it uniquely identifies the prescriber and is allowed by state law. In other cases, the prescriber's state license number or Unique Provider Identification Number (UPIN#) shall be used." CMS "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE)," 4.27.2006, page 12, Section 2 (emphasis added).

114.    Thus, Part D Sponsors or their PBMs must report Part D claims data that "uniquely identifies" the prescriber, either through a DEA number, or the prescriber's State license number, or through his unique Provider Identification Number ("UPIN"), when reporting PDE data.

115.    The vast majority of Part D claims submitted to CMS originate from electronic data transmitted by the pharmacy, such as the Defendants in the current action, to the Plan Sponsor or PBM at the point of sale (POS).  The POS at the Defendant pharmacies occurs when the Part D beneficiary is at the pharmacy counter or when a fax order is being processed after receipt at any of the Defendant compound and retail pharmacies.

## PHARMACIES SUBMIT NDC CODES TO SPONSORS OR THEIR PBMS TO SUBMIT TO CMS

116.    The PDE data elements that identify the dispensed drug are contained in Field 15, "Product/Service ID," which identifies the dispensed drug using an 11-digit NDC number. "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE)," 4.27.2006, page 13, Section 2.

117.    Again. The basis for the dispensed drug event, which is included in the PDE, originates with the claim for compensation submitted by a pharmacy after receipt of a prescription.

## PHARMACIES SUBMIT DRUG COSTS DATA TO THEIR PART D SPONSORS OR THEIR PBMS TO SUBMIT TO CMS

118.    When Part D Sponsors or their PBMs report PDE data to CMS, these data elements include the costs associated with each dispensing event. CMS uses these PDE data elements, in part, to determine the capitated payments (monthly subsidy) paid for each Medicare Part D beneficiary. 42 C.F.R. § 423.505(k). The Part D Sponsor or PBM is required to submit the cost of the drug actually dispensed to the Part D beneficiary.  Again, the costs originate from the cost of dispensing as reported from the pharmacies in the Sponsor or Plans network.

119.    CMS requires accurate reporting by the Part D Sponsor or PBM of the following three data elements from PDE records to determine costs that qualify for payment under the

Medicare benefit: Field 27 (Ingredient Cost Paid), the amount paid to the pharmacy for the drug itself, not including dispensing fees or other costs; Field 28 (Dispensing Fee Paid), the amount paid to the pharmacy for dispensing the medication, including only "activities related to the transfer of possession the drug from the pharmacy to the beneficiary, including charges associated with mixing drugs, delivery, and overhead as delineated in the final rule § 423.100 and the preamble to the rule, which fee may be negotiated with pharmacies at the plan or PBM level;" Field 29 (Sales Tax), all amounts paid to the pharmacy to cover sales tax. "Updated Instructions: Requirements for Submitting Prescription Drug Event Data (PDE)," 4.27.2006, pages 14-15.

120.    Based upon these three data elements, CMS determines the costs associated with each prescribing event that qualifies for Medicare Part D payment. Not only is it mandatory, but it is crucial, that the Part D Sponsor or submitting PBM accurately reports to CMS the NDC for the drug actually dispensed, as the cost the pharmacy paid for the particular drug is based upon the NDC.

121.    If the Part D Sponsor submits an NDC to CMS for a drug other than the drug actually dispensed, then the data submitted in the Cost Fields (27 through 29) which is tied to a particular NDC is false.

## PART D REQUIREMENT FOR DISPENSING "COVERED DRUGS" /REQUIREMENT OF PRESCRIPTION

### 1.  Requirements of a Valid Prescription

122.    Pursuant to Section 1860D-2(e)(1)(A) of the Social Security Act, a "covered Part D drug" is defined as a drug that is "dispensed only upon prescription and that is described in subparagraph (A)(i), (A)(ii), or (A)(iii) of section 1927(k)(2)." 42 U.S.C. 1395w-102(e).

123.   Part D allows payment for any use of a covered Part D drug for a medically accepted indication. § 1395w-102(e)(1)(B).

124.   The term "covered outpatient drug" is defined in Section 1927(k)(2)(A) of the Social Security Act, 42 U.S.C. 1396r-8, to mean, "of those drugs which are treated as prescribed drugs for purposes of section 1905(a)(12) [the Medicaid statute], a drug which may be dispensed only upon prescription," except as provided in paragraph (5), and subject to the exceptions in paragraph (3). See also 42 C.F.R. 423.100.

125.   *A valid prescription* is defined as a prescription that complies with all applicable State law requirements constituting a valid prescription.  42 C.F.R. 423.100.  Thus, a claim for compensation submitted to CMS without a valid prescription pursuant to state law is a false claim for payment.

126.   In Florida, a valid written prescription for a medicinal drug is one that is issued by a health care practitioner licensed by law to prescribe such a drug, is legibly printed or typed so as to be capable of being understood by the pharmacist filling the prescription; and contains the name of the prescribing practitioner, the name and strength of the drug prescribed, the quantity of the drug prescribed, and the directions for use of the drug.  Additionally, the written prescription must be dated and signed by the prescribing practitioner on the day when issued. Fl. Stat. 456.42(1).

127.   In Florida, in order for an electronically generated and transmitted prescription to be valid, it "must contain the name of the prescribing practitioner, the name and strength of the drug prescribed, the quantity of the drug prescribed in numerical format, and the directions for use of the drug.  It must be dated and signed by the prescribing practitioner only on the

day issued, which signature may be in an electronic format as prescribed by state law. Fl. Stat. 456.42 (2).

### 2.  "Covered Part D Drug" must be meet all Medicaid Requirements and be approved for Coverage by CMS under Sponsor's Plan

128.    Although Medicare Part D drugs must meet all Medicaid requirements, all drugs covered under the Medicaid drug program are not necessarily covered under Part D. Section 1860D-2(e) of the Social Security Act, 42 U.S.C. 1395w-102(e)(2).

129.    Under Medicare Part D, CMS can pay only for drugs that both meet the definition of "covered Part D drug" and are approved for coverage under the Sponsor's specific Plan. Section 1860D 2(e) of the Social Security Act. See also 4/26/06 CMS Requirements for Submitting Prescription Drug Event Data, p. 20.

130.    A common fraud scheme to get around the requirements of coverage for a Sponsor's specific plan or "covered Part D Drug" is the altering of an original prescription to change the prescription so that it falls under the coverage provided under a Sponsor's specific Plan.

131.    As such, federal regulations specifically require that each Part D Sponsor have an established drug utilization management and quality assurance programs. 42 C.F.R. § 423.153(a). A drug utilization management program includes "policies and systems to prevent over-utilization … of prescribed medications." 42 C.F.R. 423.153(b)(2).

132.    Quality assurance programs include compliance by network pharmacies with State pharmacy practice and concurrent Drug Utilization Review ("DUR"). The purpose of concurrent DUR, is to ensure that a review of the prescribed therapy is performed before each prescription is dispensed to a Part D beneficiary. Concurrent DUR must include age and

gender contraindications, over-utilization, and incorrect dosage or duration of drug therapy. 42 C.F.R. § 423.153©.

### 3. Part D Drugs – National Drug Codes

133.    Pursuant to Section 1927(k)(3) of the Social Security Act, 42 U.S.C. 1396r-8, the term "covered outpatient drug" includes only those drugs for which a National Drug Code number is required by the Food and Drug Administration, and specifically excludes "a drug or biological used for a medical indication which is not a medically accepted indication."

134.    For obvious safety reasons, Federal Regulations further require drug manufacturers or labelers to assign an expiration date to each pharmaceutical product, which must appear on the label. 21 C.F.R. 201.17. 21 C.F.R. 211.137(a) and (d) (expiration dating).

135.    Thus, the container received by the pharmacist from the manufacturer or labeler bears the NDC, including the expiration date, as required by Federal Regulations.

136.    Therefore, the Federal government will only pay for drugs under Medicare Part D that are identified by NDC number when used for medically accepted indications, which are listed in the labeling approved by the FDA, or use of which is supported by one of the drug compendia identified in the Medicaid statute. See, Section 1927(g)(1)(B)(i) of the Social Security Act.

## PART D REQUIRES COMPLIANCE WITH ALL APPLICABLE STATE PHARMACY LAWS

137.    In addition to meeting the Medicaid statute's definition of "prescribed drug," covered Part D drugs must be dispensed in accordance with State pharmacy laws and regulations. 42 C.F.R. § 423.505(i)(4)(iv) (requiring compliance with Federal laws, Regulations, and CMS instructions); 42 C.F.R. § 423.504(b)(iv)(A)(requiring compliance with applicable Federal

and state standards); 42 C.F.R. § 423.153(c)(1) (Sponsors must represent that that network providers are required to comply with state pharmacy standards).

138.   Here, the Defendants, the network pharmacy providers, as network providers for the Part D Plan Sponsors, were required to comply with CMS Part D laws and all regulations mandating adherence to state pharmacy laws.

139.   States, including Florida, have enacted stringent laws regulating the practice of pharmacy and the practice of medicine to protect patients from harm resulting from the use of unsafe or inappropriate drugs and from the improper practice of medicine and pharmacy.

140.   Under the Florida State laws, for the patient to receive a prescription drug, a licensed health care practitioner who determines the appropriate treatment, and issues a prescription for an FDA-approved drug, must examine the patient. The prescription may also authorize refills.

141.   The patient then has the prescription filled by a registered pharmacist working in a licensed pharmacy that meets all State law requirements.

## CMS IDENTIFIES AREAS SUSCEPTIBLE TO FRAUD BY PART D STAKEHOLDERS

142.   CMS has identified specific risk areas of vulnerability for fraud, waste and abuse by specific key.

### 1. Part D Sponsor and PBM Fraud, Waste and Abuse

143.   Sponsor and PBM fraud, waste and abuse occurs where the Part D Sponsors fails to provide medically necessary services to Part D enrollees where this failure is likely to adversely affect the enrollee. CMS Prescription Drug Manual, Chapter 9, Section 70.1.1, pages 54-55.

144.    The failure to ensure that the drug was prescribed by a licensed professional, the failure to deny claims for expired or obsolete drugs, and the failure to reject claims based on gender contraindications are all examples of Sponsor and PBM fraud, waste and abuse that adversely affect the enrollee.

145.    Another area of Sponsor and PBM fraud, waste and abuse includes payments for excluded drugs in violation of the Sponsor's obligation to ensure that they only provide coverage for "covered Part D drugs," under 42 C.F.R. § 423.100, as listed in the Sponsor's approved formularies, and in accordance with Section 1860D-2(e)(2) of the Social Security Act.

146.    In addition, where a Part D Plan or PBM "misrepresents or falsifies information it furnishes to CMS or to an individual under the Part D drug benefit program;" and when the PBM or "Sponsor submits inaccurate or incomplete prescription drug event (PDE) data or Part D Plan quarterly data," these are also examples of Sponsor fraud waste and abuse. CMS Prescription Drug Manual, Chapter 9, Section 70.1.1, page 56.

147.    Fraud, waste and abuse by a Part D PBM, as identified by CMS, includes most of the same examples listed for Part D Plans, but also includes failure to offer a beneficiary the negotiated price of a Part D drug. CMS Prescription Drug Manual, Chapter 9, Section 70.1.2, pgs. 57-58.

2.    **Fraud, Waste, and Abuse by Downstream Entities, such as Pharmacies**

148.    Examples of pharmacy, fraud, waste, and abuse as identified by CMS include: billing practices (billing for non-covered prescriptions as covered items, drug diversion, etc.); Prescription forging or altering, prescription splitting to receive additional dispensing fees,

bait and switch pricing; dispensing expired or adulterated drugs, and failure to offer negotiated process. CMS Prescription Drugs Manual, Chapter 9, Section 70.1.3, page 58.

### 3. Requirements of Part D First Tier, Downstream, and related Entities: All Part D Downstream Entities Must Comply with all Applicable Federal and State Laws and Regulations, and CMS Instructions

149.   As described above, Federal Regulations require that Part D Sponsors follow applicable State pharmacy laws. This requirement also applies to any first tier, downstream, or related entity under contract to perform any of the Part D Sponsor's activities or responsibilities under the Part D contract with CMS. 42 C.F.R. § 423.505(i)(4)(iv) provides that "If any of the Part D Plan Sponsors' activities or responsibilities under its contract with CMS is delegated to other parties, the following requirements apply to any related entity, contractor, subcontractor, or pharmacy: ... [a]ll contracts or written arrangements must specify that the related entity, contractor, or subcontractor must comply with all applicable Federal laws, regulations, and CMS instructions."

150.   Federal Regulations specifically require that Part D Sponsors establish quality assurance measures and systems that require the Sponsor's network providers "to comply with minimum standards for pharmacy practice as established by the States." 42 C.F.R. § 423.153(c)(1). A "network" provider is described as a pharmacy where enrollees may be expected to obtain covered Part D drugs. See 42 C.F.R. § 423.128(b)(5) and (6).

151.   In addition, Federal Regulations also require that Part D Sponsors comply with State law requirements as described in 42 C.F.R. § 423.505(b)(15) (Part D Sponsors qualification under state law as insurers) and meet all applicable Federal and State standards. 42 C.F.R. §423.504(b)(iv)(A).

### E.   FLORIDA PHARMACY STATUTES AND ADMINISTRATIVE CODE

152.   The Florida legislature enacted standards of practice relating to the practice of pharmacy which "shall be binding on every state agency and shall be applied by such agencies when enforcing or implementing any authority granted by any applicable statute, rule, or regulation, whether federal or state." Fl. Stat. 465.0155.

153.   The Florida legislature enacted statutes expressly limited the "practice of pharmacy" and setting regulations for the practice of "compound pharmacy" to protect consumers and the public.

154.   Compounding "means combining, mixing, or altering the ingredients of one or more drugs or products to create another drug or product. Fl. Stat. 465.003 (18).  The term "special pharmacy" includes every location where medicinal drugs are compounded …. Fl. Stat. 465.003 (11)(a)(4).

**1.   Practice of pharmacy can only be performed by a pharmacist; and is expressly prohibited from being performed but a pharmacy technician**

155.   The "practice of the profession of pharmacy" includes compounding, dispensing, or consulting concerning contents, therapeutic values, and uses of medicinal drugs; consulting concerning therapeutic values, and interactions of patent or proprietary preparations whether pursuant to prescriptions or in the absence of prescriptions or orders; and other "pharmaceutical services". Fl. Stat. 465.003 (12).

156. The practice of "pharmaceutical services" includes the monitoring of the patient's drug therapy and assisting the patient in the management of his or her drug therapy, and includes review of the patient's drug therapy and communication with the patient's prescribing health care provider. Fl. Stat. 465.003 (13).

157.   Practice of the profession of pharmacy also includes any other "act, service, operation, research, or transaction incidental to, or forming a part of, any of the foregoing acts, requiring, involving, or employing the science or art of any branch of the pharmaceutical profession, study, or training, and shall expressly permit a pharmacist to transmit information from persons authorized to prescribe medicinal drugs to their patients." Fl. Stat. 465.003 (12).

158.   "A person other than a licensed pharmacist or pharmacy intern may not engage in the practice of the profession of pharmacy..." Fla Stat. Title 32, Chapter 465.014. As such, a pharmacy technician is included among the individuals prohibited from engaging in the practice of pharmacy.

159.   Pursuant to the authority delegated in Fl. Stat. 465.0155., the Administrative Code expressly prohibits the following acts associated with the practice of pharmacy from being performed by anyone other than a licensed a pharmacist or supervised, registered pharmacy intern: (a) supervising the controlled substance inventory, (b) receiving verbal prescriptions from a practitioner; (c) interpreting and identifying prescription contents; (d) engaging in consultation with a practitioner regarding interpretation of the prescription and date in patient profile; (e) engaging in professional communication with practitioners, nurses or other health professionals; (f) advising or consulting with a patient, both as to the prescription and the patient profile record.  Admin. Code 64B16-27.1001(1)(a-b).

160.   Additionally, only a pharmacist may make the final check of the completed prescription. Admin Code 64B16.27.1001(1)(a-b).

161.    Likewise, under Florida law, a pharmacist dispensing a prescription drug must perform a Drug Utilization Review (DUR), including an offer to counsel the patient, before any prescription is filled or refilled.  Chapter 456 Florida Statutes Section 465.003(6).

162.    "The pharmacist performing in this state any of the acts defined as 'the practice of the profession of pharmacy' in Section 465.003(13), F.S., shall be actively licensed as a pharmacist in this state, regardless of whether the practice occurs in a permitted location (facility) or other location." Admin. Code 64B16.1001(5).

163.    Notably, nothing in the Florida Statute "shall be interpreted to permit an alteration of a prescriber's directions, the diagnosis or treatment of any disease; initiation of any drug therapy; the practice of medicine; or the practice of osteopathic medicine, unless otherwise permitted by law." Fl. Stat. 465.003 (12).   Thus, neither a licensed pharmacist, nor a pharmacy technician, can alter a physician's prescription following receipt by the pharmacy.

164.    The only exception that allows a licensed pharmacist to alter the original prescription from a licensed physician is when a licensed pharmacist substitutes a prescription for a generic brand of higher or lesser cost after full disclosure to the customer of the retail amount, or with permission of the prescribing physician in the form of a valid Collaborative Practice Agreement (CPA) specifically between the individual pharmacist and individual prescribing physician. Fl. Stat. 466.025 (specifying the requirements for substituting a name brand drug with a generic brand drug).

### 2.   All tasks performed by a pharmacy technician must be under the direct supervision of a licensed pharmacist

165.    Although pharm techs cannot perform any of the actions referenced in the above paragraph defined as the "practice of pharmacy," the state of Florida has set specific rules

regarding the supervision of any tasks that are delegated to a registered pharmacy technician or pharmacy technician in training. However, a "pharmacist shall not delegate more tasks than he or she can personally supervise and ensure compliance with this rule." Rule 64B16-27.420, F.A.C. Specifically, a pharmacist may delegate those non-discretionary delegable tasks enumerated in Rule 64B16-27.420, to a Registered Pharm techs (RPT) or Pharmacy Technician in Training (PTT), but those individuals must be supervised. *Id.*

166. However, even those delegated tasks must be under the "direct supervision" of a pharmacist who is "on the premises at all times the delegated tasks are being perform, who is aware of the delegated tasks being performed and who is readily available to provide personal assistance, direction, and approval throughout the time delegated tasks are being performed," or a pharmacist may "employ technological means of communicate with or observe the pharmacy technician. Rule 64B16-27.420 (2)(a) – (b), F.A.C. Thus, a pharmacy technician cannot function under the "supervision" of a licensed pharmacist at a different physical location than that of the technician, unless technological means have been employed to communicate and observe the technician.

167. A pharmacy department shall be considered closed whenever a Florida licensed pharmacist is not present and on duty. Fl. Stat. 465.003(11)(b).

168. Additionally, only a pharmacist may make the final check of the completed prescription thereby assuming the complete responsibility for its preparation and accuracy. Admin Code 64B16-27.1001(1)(a-b).

169. Florida also enacted stringent guidelines on the transferring of prescriptions for filling of re-filling, requiring records to be maintained the recording the transfer to or from another pharmacy of any prescription to be filled. Fla Stat. Title 32, Chapter 465.026.

### 3. Requirement for transferred prescriptions

170.   Florida has also enacted stringent guidelines on the transferring of prescriptions for filling or re-filling, requiring records to be maintained recording the transfer to and from another pharmacy of any prescription to be filled. Fla. Stat. Tile 32, Chapter 465.0326.

### 4. Controlled Substance Dispensing

171.   A pharmacist may only dispense a controlled substance upon written or oral prescription of a physician, and in the course of professional practice. Fl. Stat. 893.04

### F.   FLORIDA STATE KICK BACKS

172.   Pursuant to Fl. Stat. 465.185, "[i]t is unlawful for any person to pay or receive any commission, bonus, kickback, or rebate or engage in any split-fee arrangement in any form whatsoever with any physician, surgeon, organization, agency, or person, either directly or indirectly, for patients referred to a pharmacy registered under this chapter."

## VI.   FACTUAL ALLEGATIONS

173.   The term compounding pharmacy describes a pharmacy that prepares prescriptions for drugs to order for each customer in a process that is called compounding.

174.   The main advantage to a compounding pharmacy or "compounding" prescriptions is to allow the form of the medication to be changed in a manner that is beneficial to the patient or tailors to the unique needs of a particular patient.  For example, a compounding pharmacy can alter the type of medication from a pill form to a topical form, a dissolvable form, or add flavor to make the medication more acceptable.  Additionally, a patient may have an allergy

to the mass-marketed form of a medication, or the dosage of the mass-marketed form of the medication may be improper for a patient's needs. Thus, a compounding pharmacy can accommodate the patient's needs.

175.   Compounding pharmacies are designed to accommodate a patient's needs with individually tailored medications, as prescribed and ordered by a licensed physician or pharmacist in conjunction with the physician's permission, as permitted by state laws.

176.   As such, compounding pharmacies do not dispense commercially available products unless a patient has an allergy to a particular medicine that needs to be altered, or the patient's needs are not suited to the mass-marketed drug.

A. **HABANA'S SCHEME TO DEFRAUD THE UNITED STATES GOVERNMENT, MEDICARE, MEDICAID, AND TRICARE**

177.   This is an action by Relator against Defendants for violation of the Acts, and arises out of Defendants presenting, and/or causing to be presented, false claims to government healthcare programs for the payment of compound prescriptions.

178.   Defendants knowingly submitted fraudulent claims for payment of prescriptions that were deliberately altered and forged by individuals who were not licensed physicians or pharmacists. A sample of the documentary evidence that demonstrates the scheme is contained within, which consists of copies of prescriptions forged by employees and submitted to government healthcare programs. These prescriptions were submitted as if they were validly written and approved by a licensed pharmacist or physician rather than through the illegal actions of pharm techs at the direction of the Defendants. The submission of fraudulent prescriptions for payment are shown in one or more of the following patterns: (1) medically unnecessary and often dangerous drug substitutions, (2) splitting prescriptions, (3)

offering incentives to patients; and (4) offering illegal incentives to employees for referral of customers to the pharmacies.

Standard procedures for legally receiving and processing compound prescriptions

179.  Defendants, primarily through the direction of pharmacy techs ("pharm techs") working at one of the Defendants compound pharmacies would receive an original written prescription from a patient in person at the front counter of the compound pharmacy, receive the written prescription via Metrofax, facsimile transmission, or a prescriber may call in a prescription directly to the compounding pharmacy. **(See, Exhibit 1; Exhibit 1A; Exhibit 1B).**

180.  Notably, only a licensed pharmacist can prepare or write a phoned in prescription from a prescribing physician or prescribing physician's office into a written prescription. See, Pharm Admin Code 64B16-27.103.

181.  There are no circumstances in which a pharm tech may take an oral request for an original prescription.  A pharm tech can only take an oral request when the oral request is for a refill of an original prescription from a physician or a physician agent, and the oral request for the refill is dictated by the pharm tech on a printed, pre-made form provided by the pharmacy.  An example of the pre-made form in which the oral refill request must be taken by a pharm tech used by the Defendants to comply with the exception is attached.  **(See, Exhibit 1C).**  Accordingly, no request taken by a pharm tech can ever be taken on a standard prescription pad.

182.  Defendants provided prescription order forms to physicians with pre-formulated options for the physician to select. **(See, Exhibit 2).**

183. Despite physicians being presented with a pre-formulated form with compound prescription options from which the physicians must select, Defendants continually, and illegally, altered the selected formulations as described in below paragraphs to select alternate drugs that would drive up the retail price paid to the Defendants.

184. After an original prescription was received by one of the three methods described above (in-person, facsimile, or phone), the pharm tech should assign the prescription a prescription number. Next, the pharm tech should scan in and attach the original prescription image to the assigned prescription number, which was entered into the system, PK or "The Compounder", used by the Defendants.

185. Next, if the patient was paying for the prescription using a health insurance program, including government healthcare programs, to submit the prescription the pharm tech should type in the drugs indicated on the prescription, as written by the prescribing physician, and assigned prescription number.   Once the pharm tech enters this information into the corresponding program, the entry constitutes a submission for payment to the insurance program. The submission can result in an acceptance or denial for payment.  A denial would generally indicate a prescription, or component within the prescription, did not qualify for coverage by the healthcare or insurance program.

186. It was at this juncture, that the primary method by which prescriptions were knowingly altered and forged by the Defendants was achieved through the use and direction of pharm techs, in violation of state law, at Defendants' pharmacy locations.

**B. ALTERING AND FORGING PRESCRIPTIONS**

187.    The Defendants' primary method by which prescriptions were altered or forged was through the direction of pharm techs at Defendants' pharmacy locations that included "force-fitting" various combinations of formulas to payors until a "winning" payment authorization was achieved.

188.    Defendants altered and reformulated prescriptions received from physicians for compound prescriptions for patients.  By doing so, the original prescriptions were rendered invalid pursuant to federal and state law.   See, 42 C.F.R. 423.100 (federal regulation mandating that submissions for payment to government healthcare programs requires a valid prescription and that the validity of a prescription is set by state law); Fl. Stat. 456.42(1) (Florida statute defining valid prescriptions).

189.    The original prescriptions were manipulated to include or substitute drugs or ingredients for the original compound prescription to create a new and different prescription that would be authorized for payment by the government healthcare programs.  There are two reasons the Defendants manipulated the original prescription:  first, to fraudulently optimize the reimbursement rate obtained from the government healthcare program; and second to fraudulently create a reimbursable prescription that would not otherwise have been authorized for payment from the government healthcare program.

190.    Defendants and non-pharmacist employees created false prescription data by rewriting the prescriptions and entering false prescription numbers and data into the reimbursement programs as submissions for payment from government healthcare programs.   The Defendants' fraudulent actions resulted in patients receiving entirely different drugs from those prescribed.  This was performed not only by making illegal modifications of the

ingredients, but also by substitutions of retail drugs for compound drug prescriptions without the physician's knowledge, often to the detriment of patients' health.

191.   Pharm techs would "play" the submission system by "force feeding" fraudulent prescription data for each individual prescription in as many permutations as possible until they were able to obtain a "winning combination" of a formula that would receive confirmation or authorization of payment from a government healthcare program.

192.   Once authorized by the government healthcare program, the pharm tech would forge a new, ostensibly original prescription to match the authorized, fraudulent prescription submission.

193.   Finally, the pharm tech would (1) sign off on the forged prescription misrepresenting themselves as a pharmacist, or (2) take the forged prescription to a complicit pharmacist for the the pharmacist's signature. (See, Exhibit 2B).

194.   There were two primary methods by which the Defendants would document or record a fraudulent prescription.  First, pharm techs would write the altered formula directly on a request for a prescription received by facsimile on the left-hand side of the form as if it were part of a legal alteration made by a pharmacist under a Collaborative Practice Agreement (CPA).  (See, Exhibit 2 and Exhibit 2A).  Second, the pharm techs would forge a "new" prescription that appeared as an original oral request for a prescription from a physician taken by a pharmacist or an original hard copy submission of a prescription.  (See, Exhibit 2C, Exhibit 2B, and Exhibit 27).  However, even an oral prescription cannot legally be performed by pharm techs, and upon knowledge and belief of the Relator, prescriptions were rarely, if ever, requested via telephone or brought to the pharmacy in hard copy form. Instead, this method was used to conceal the lack of a valid prescription on file with the

Defendants. Defendants would then file the fraudulent prescriptions together with the original faxed prescription in the pharmacy records, even though the prescriptions did not match. Defendants believed the filing process looked better in case of an audit. **(See, Exhibit 2B)**. On many occasions, pharm techs would even forge oral prescriptions despite no original oral request or prescription existing. **(See, Exhibit 27)**.

195.    At the beginning of Relator's employment with Defendants, as stated above, Defendants would file the forged or altered prescriptions with the original faxed prescription even though the prescriptions did not match.  However, as described in the proceeding sections, the Defendants evolved their schemes as Relator and prescription benefit managers (PBMs) called into question their practices and requested original prescriptions.

196.    The above schemes would begin after the pharm tech determined that the drug or product specified on the original prescription was not covered by a government healthcare program after submitting the prescription data for payment from the patient's healthcare programs or insurance program.  At that time, the force feeding the submission system for a winning combination for payment authorization would begin.

197.    Without having a valid prescription, pharm techs, at the Defendants' direction, would knowingly create a new prescription number, knowingly alter the formulation on the original prescription or substitute the compound for a retail drug without consultation of a licensed pharmacist, and submit repeated false claims.  Each repeated false claim was force fed as a new prescription submission until an altered or forged prescription formula or drug winning combination was authorized for payment and coverage.

198.    For example, as Relator's testimony will show, while she was working at Defendant, Habana Hospital Pharmacy (HHP), the Relator viewed records containing 10-12 submissions

of false compound prescriptions submitted by a pharm tech prior to the final submission being accepted.

199.    After Relator was employed by the Defendant, she became aware of the common practice at HHP whereby pharm techs gamed the submission of a formula, through often multiple, fraudulent submissions described above until a payor system afforded payment authorization, and then forged a prescription to match the accepted formula.

200.    The Defendants' practice of filing forged prescriptions and mismatching original prescriptions with the paid claim submitted to government health programs openly continued at all Defendant's pharmacies, except for HHP, once Relator opposed the practice following commencement of her employment with Defendant, HHP.

201.    All claims for compensation submitted by the Defendants to government health care programs, in the manner discussed in this complaint, were false claims because no valid prescription existed pursuant to federal and state laws.    Any claim for payment to a government healthcare program must be based *upon a valid prescription.*    See, 42 C.F.R. 423.100 (federal regulation mandating that submissions for payment to government healthcare programs require a valid prescription and that the validity of a prescription is set by state law); Fl. Stat. 456.42(1)(Florida statute defining valid prescriptions).

202.    The Relator witnessed Defendant owners, Ryan Goodkin and Terrence Myers, knowingly and intentionally directing pharm techs to re-write original prescriptions without the knowledge or permission of a licensed physician or permission of a pharmacist as specified and required by state law.    Further, Relator witnessed Mr. Goodkin and Mr. Myers submit the fraudulently force-fitting these re-written, fraudulent prescriptions under false prescription numbers to the U.S. Government, often changing the formula, until a winning

payment authorization was obtained that would be covered by the PBM for the government healthcare programs.

203. Additionally, the Relator became aware that Defendants were directing pharm techs to continue with the common practice of making false submissions, identifying formulas that would be paid by healthcare programs, and forging prescriptions to match the authorized formula.

204. Additionally, several distinguishable schemes were put into place by Defendants to increase the retail cost paid by insurance programs to Defendants and to offer incentives to customers to fill their prescriptions at the Defendant pharmacies with unlawful kickback/remuneration schemes. These schemes, on information and belief of Relator consisted of medically unnecessary and often dangerous drug substitutions, splitting prescriptions and offering incentives to patients; and offering illegal incentives to employees for referral of customers to the pharmacies. The schemes, on information and belief of Relator are as follows:

## C. DRIVING UP RETAIL PRICE THROUGH USE OF MEDICALLY UNNECESSARY DRUG SUBSTITUTIONS

205. The first scheme involved the Defendants directing pharm techs to knowingly alter or forge prescriptions by making illegal "substitutions" of drugs or ingredients indicated on an original written prescription. The prescription fraud was performed by creating fraudulent "oral" or written prescriptions or by illegally altering the formulation of a compound prescription to include medically unnecessary drugs that would obtain a higher billable or retail amount from a government healthcare program when the claim was submitted as compared to the cost authorized using the original prescription.

206.    This scheme also involved Defendants making multiple false submissions for compound or retails drugs to healthcare programs to identify payable formulas for compound drugs. Each of these submissions had no valid prescription to justify the false submissions which all were for payment.

207.    As with many of the Defendants' schemes, the Defendants most often knowingly directed pharm techs to independently create these illegal substitutions, without direct supervision of a licensed pharmacist or physician employees.  Although, on occasion Defendant owners, who were also licensed Pharm Ds, participated in the creation of fraudulent prescriptions and submissions.

208.    The substitution scheme was used across the spectrum of prescriptions that were received by Defendants and with various prescriptions submitted to all insurance programs, including Medicare Part D, Florida Medicaid, and Tricare, by the Defendant owners and employees identifying drugs with Average Wholesale Prices (AWPs) that were higher on a recurring basis to be used as the substitutions.

209.    Relator witnessed day to day conversations and emails between Defendant owner and pharmacist Terrence Myers, and pharm tech, Sean Francisco, about which drugs' Average Wholesale Price (AWP) were highest or had been increased, and Relator would then witness those ingredients or drugs being substituted into prescriptions being compounded.

210.    Not only were these substitutions illegally made, resulting in false claims; they were made by a pharm tech not possessing either the clinical training to understand the pharmacology of such a substitutions or legal authority by way of any license.  Relator's professional, clinical review of these fraudulently substituted compound prescriptions revealed that the substitutions often had no relationship to the treatment or diagnosis for

which the original prescription was prescribed by the physician. In fact, Defendants submitted compound prescriptions for payment from the government healthcare programs that contained drugs that were medically unnecessary, while also frustrating patient therapy and endangering patient safety. **(See, Exhibit 3, Exhibit 3A, Exhibit 3B, and Exhibit 3C).**

211.  Commonly used drugs in Defendant's scheme illegally substituting medically unnecessary drugs to drive up the retail costs included neurological (neuro) treatment agents being substituted into creams requested for muscle and joint pain by pharm techs. *Id.*

212.  These neuro agents, as substituted, were often medically unnecessary. Moreover, these drug substitutions would not be readily identified by an individual unless they had training regarding the indications of use of the drugs and pharmacology of the drugs used within the compound. However, even with formal training, most importantly, without knowledge of the original prescriptions, which were more appropriate for the conditions -- "muscle and joint pain" -- indicated by the patient's physician on the facsimile prescription, the illegal Substitution would easily be overlooked by a PBM and the Defendants get paid the substituted drugs.

213.  Examples within the documentary evidence includes **Exhibit 2A**, which shows an original prescription template "checked-marked" by the prescribing physician "muscle and joint pain," specifically notated by the physician for a patient's hip pain. The original, specific prescription checked by the prescribing physician included "Diclofenac 5%, Gabapentin 6%, Cyclobenzaprine 4%, Clonidine 0.2%, Gabapentin 6%." But the prescription was illegally altered, on the left-hand side of the column to include additional drugs/ingredients, adding Lidocaine, while retaining t`he Diclofenac, and including three additional ingredients not checked-marked on the form by the physician. Although, one of

51

the ingredients, Celecoxib (non-steroidal anti-inflammatory),  could arguably be medically connected, if substituted legally, the other two substituted drugs were not medically necessary -- Duloxetine (serotonin-norepinephrine reuptake inhibitor (SNRI), mostly prescribed for major depressive disorder, generalized anxiety disorder, fibromyalgia and neuropathic pain), and Lamotrigine (Anticonvulsant, commonly used to treat epilepsy).  The entire prescription substitution was improper, and, the insertion of Lamotrigine and Duloxetine is also medically unnecessary, as it has no connection to treating hip pain.  The purposes of this substitute was exclusively to inflate the cost (and reimbursement) of the original prescription. Additionally, no legal CPA was on file for this patient, nor was there ever a request from a pharmacist to the physician to make the change through a written or oral request.  It should be noted that Dr. Patel did not sign off on this example prescription change or any other prescription change, nor did Defendant owners have a CPA in place to allow these changes to be made on behalf of Dr. Patel by a licensed pharmacist.

214.    During Relator's attempts to cross-check suspected forged and altered prescriptions with the original prescriptions alleged to have resulted from faxed prescriptions through Metrofax, Relator noted several instances where no original fax could be identified for prescriptions. Thus, the pharm techs were creating from whole cloth prescriptions and commencing new drug therapies.  This is a manifestly and expressly nondelegable task that may only be performed by pharmacists.  Pharm techs knowingly initiated these new drug therapies to utilize more expensive compounds.

**MEDICALLY UNNECESSARY SUBSTITUTIONS – TRICARE SPECIFIC**

215.    A second scheme, and method Defendants knowingly and illegally used to include medically unnecessary drugs into compound prescriptions to drive up the retail cost charged

to the government health care programs, was to routinely and specifically include, Bacitracin, into compound prescriptions.

216.   Defendants, through pharm techs, and without permission of a licensed pharmacist or prescribing physician, knowingly and intentionally submitted claims for payment to the government healthcare program, Tricare, for un-prescribed, medically unnecessary and very expensive Bacitracin because the payment rate could exceed $10,000.00.

217.   On one occasion, Defendants were immediately flagged for an individual prescription audit due to the costs of the reimbursement. **(See, Exhibit 4 and Exhibit 11)**.  Upon, inquiry to the physician to obtain an original copy of the prescription for Bacitracin, Realtor became aware that the doctor had not written a prescription for the drug.

218.   Defendants knowingly submitted the above described false claims containing no valid prescriptions to Tricare.

**D.   DRIVING UP RETAIL PRICE BY UNLAWFULLY SPLITTING PRESCRIPTIONS AND OFFERING INCENTIVES TO CUSTOMERS**

219.   Another scheme, included Defendants knowingly directing pharm techs to split an original compound prescription into two separate prescriptions in order to receive a higher retail rate for reimbursement from the government health care program.

220.   There were two specific drugs most commonly used by Defendants in this scheme -- Diclofenac and Lidocaine -- both of which are commercially available.

221.   Defendants had several variations of the schemes used with these two drugs, as described in the below paragraphs.

222.   First, Defendants directed pharm techs to perform a "bait and switch" on patients whereby the pharm techs would illegally "split" a compound prescription received from a physician and forge two new, separate prescriptions -- one compound and one retail prescription. This "splitting" of the prescriptions provided no benefit to the patient and the indication of use of the two separate prescriptions was not related to treatment for the patient's conditions. This was done for the exclusive purpose of increasing Defendant's reimbursement rate from healthcare programs.

223.   Defendants would split the original prescription into two forged, and thus invalid, prescriptions. The first would be a "compound" prescription of various components, and the second would be a large amount of either Diclofenac or Lidocaine. **(See, Exhibit 5, and Exhibit 6).**

224.   The Defendants would provide the "compound" prescription to the patient at no cost (free), by stating they were waiving the copay, an illegal act, to incentivize the patient to process their prescriptions through Defendants, and would only charge the patient the co-pay for either the Diclofenac or Lidocaine.

225.   The Defendants' pharm techs would even advise patients to apply the two topical creams separately into the part of their body and use a blow dryer to combine the dry the creams together.

226.   In these situations, Defendants would present both drugs, the compound and the Lidocaine or Diclofenac, to the patient in a container only designated for compound prescriptions to conceal the "bait and switch" to the patients.

227.   Defendants sought to include and charge for commercially available Diclofenac and/or Lidocaine as a substitute or portion of as many original compound prescriptions as possible and submitting claims to government healthcare programs for these fraudulently substituted prescriptions.  The incentive to the Defendants came with only charging the commercially available, Diclofenac or Lidocaine, to the healthcare program which would generate a higher retail price as compared with the cost of the compound prescription had a smaller amount of either drug been compounded as intended.  In most instances, neither the Diclofenac nor Lidocaine was at all related to the original compound prescription written by a physician, but Defendants would forge the prescriptions to submit a claim for payment for a large volume of either drug as a retail drug because a program may not accept compound prescriptions.

228.   The Defendants would knowingly bill the higher, commercially available products charge both the split prescriptions to the government healthcare program after illegally splitting the original physician prescription.

229.   In this manner, the Defendants would knowingly participate in unlawful remuneration schemes by appearing to offer the customer or beneficiary two separate prescriptions for the price of one, enticing them to return to Defendant pharmacies for prescription refills.

230.   The bait and switch by the Defendants was designed to to obtain the approval for federal healthcare programs that did not allow submission of compound prescriptions by only billing the commercially available Diclofenac or Lidocaine.

231.   Separate from the prescription splitting, bait and switch schemes performed by Defendants for Lidocaine and Diclofenac, the Defendants deployed a third scheme which was a variation of the splitting involving both drugs.

232.    Specifically, Defendants would forge a prescription making a request for a prescription of Diclofenac solution and Lidocaine solution on the same prescription pad.  **(See, Exhibit 7).** This was written by pharm techs as if the prescription were an original prescription from a physician.  *Id.*  Upon reasonable information and belief, Relator will testify none of the identified prescriptions resembling the **Exhibit 7** were originals, and all were forged by pharm techs without approval or knowledge of physicians.

233.    Again, due to the high reimbursement rate paid by government healthcare programs for Lidocaine, Defendants would perform a bait and switch on patients, presenting both the Lidocaine and Diclofenac in containers designated only for compound prescriptions, and would charge the healthcare program only for the Lidocaine.

234.    Defendants knowingly and fraudulently submitted claims for payment by submitting prescriptions for compensation from government healthcare programs that did not originate from a valid prescription, that were tainted by unlawful kickback schemes, and contained drugs that may have been medically unnecessary.

**E.    UNLAWFUL    ACTION    UNDER    STATE    PHARMACY    LAWS    AND ENDANGERMENT TO PATIENTS**

235.    Relator realized that pharm techs were bypassing Drug Utilization Review (DUR) while reviewing prescriptions.   Realtor became aware of the DUR bypass because the retail software program would imprint the pharmacy technician's initials that bypassed the review. Specifically, Relator noticed Office Manager Rhonda Dykes was registered as a pharm tech in the pharmacy retail computer program when she was not a registered pharm tech or pharm tech in training, and she was bypassing the DUR on various occasions.

236.   Relator noticed the Defendants placed her (Relator) as the PIC (Pharmacist in Charge) over locations and pharm techs that Relator did not know and was not in the same location to supervise or supervise through electronic means as required by state law.   When Relator removed the unauthorized pharm techs and brought the issue up to Defendants, the Defendants removed her permissions to remove pharmacy techs from being classified as under her supervision.

237.   Specifically, Defendants registered pharm techs under Relator's name on official records at an off-site billing offices, Pharmacy Grid, LLC, - Tampa and West Palm location – and Longevity, LLC.   **(See, Exhibit 26).**   Thus, Defendants knowingly allowed pharm techs to operate at locations without supervision of a licensed pharmacist on-site or through electronic means as is required by state law.

238.   Defendants also allowed pharm techs to have access to change compound logs in a similar manner as was performed in preparation for the Express Scripts audit.   Once noticed by Relator, she did what she could to prevent access to the specific pharmacy technician at issue – Gerald Bateman – by imploring assistance from a co-worker Sean Francisco to lock Mr. Bateman out of the system.   **(See, Exhibit 19).**

239.   Defendants employed pharm techs to work out of their billing offices, located at Pharmacy Grid, LLC and Longevity, LLC located at the same physical location at 101 N. Federal Highway Lake Worth, Florida and 120 N. Federal Highway, Suite 306, Lake Worth, Florida, respectively.   At these locations pharm techs worked processed billings for all pharmacies, took patients calls, and worked without supervision of a licensed pharmacist.

240.   One Defendant, owner Terrence Myers, Jr., illegally wrote non-compound prescriptions for his own family and employee's significant others, under the guise of a Collaborative

Practice Agreement. Relator also believes that owner Terrence Myers, Jr., wrote controlled-substance prescriptions for at least one patient. Relator notified Defendant, owner Ryan Goodkin, that controlled substance prescriptions were being illegally written. **(See, Exhibit 24, Exhibit 25).**

241.   Defendants concealed and denied the existence of a Habana billing office from UCM, an accrediting body under the National Association of Boards of Pharmacy, The billing office was located at 18946 Sunlake Boulevard in Lutz, Florida, where pharm techs worked as pharmacists under very little or no pharmacist supervision. **(See, Exhibit 26).**

242.   Relator became aware that Defendants were attempting to use a pediatric prescription form that did not meet the regulations and requirements for pediatrics.  As such, Realtor refused to use the invalid form and corrected the form to meet pediatric standards.

### F.   EVIDENCE OF DEFENDANTS' SCHEME - CONCEALING RECORDS AND CREATING FALSE RECORDS OF DISPENSED DRUGS THROUGH ALTERATION OF PATIENT PRESCRIPTION RECORDS

243.   In January 2016, Express Scripts, a PBM, notified Defendants that a "routine audit..." would be conducted of [Defendant's] "...prescription information." **(See, Exhibit 10).**  In February 2016, in preparation and in advance of the Express Scripts audit, Defendants altered patient prescription records inside Habana's proprietary PCCA software, "The Compounder", to indicate false modification dates.

244.   Then on January 29, 2016, Express Scripts terminated Defendants participating provider status in their network via letter correspondence. **(See, Exhibit 12).**

245.   In preparation for the audit, individual compound logs were altered by Defendant, owner Terrence Myers, Jr., to change the ingredients and date stamps on the compound logs to

match what was billed to healthcare or insurance programs from the forged prescriptions maintained by the Defendants. This was performed by Defendants by cross-referencing these documents and changing the electronic data in the Defendant's software programs on the compound logs that is associated to each individual compound prescription. An example of an unaltered compound log for a single compound prescription is attached for reference. **(See, Exhibit 14).**

246.   Defendant owner, Terrence Myers Jr., and Sean Francisco was able to mask the fraudulent alterations by preventing the date stamp in the bottom left hand corner of the document (highlighted in yellow) from properly updating and indicating the last date a modification was made to the compound log. *Id.* Instead, Defendant owner, would alter the modification date in the computer software so that it indicated the same date as the date the prescription was entered.

247.   Relator became aware of the scheme because daily signature logs, required by state law to be maintained by Defendant, Habana Hospital Pharmacy, indicate, by signature, which pharmacists were present in the pharmacy on specific days. **(See, Exhibit 13)**. The signature logs can be cross referenced with the individual compound log associated with specific individual prescriptions processed through Express Scripts reviewed during the audit. Falsified records will be identifiable because the name/initial stamp on the electronic compound log (highlighted in yellow) will indicate TM (Terrence Myers) rather than Relator's initials, or other pharmacists' initials, on dates the compound log indicates Relator, or other pharmacists were working and present. **(See, Exhibit 14)**.

248.   During the audit, Defendants concealed and denied the existence of the billing office located within and at the same registered address as Defendant, Pharmacy Grid, LLC, where

pharm techs worked as pharmacists under very little or no pharmacist supervision. The billing office was located at 120 N. Federal Highway, Suite 306, Lake Worth, Florida.

249.    During Relator's employment with Defendants, Defendants were requested by Caremark to provide an S.O.P., or Standard Operating Procedure, proving there was a process for co-pay collection and that co-pays were not waived. The document was falsely back-dated by the Defendants and supplied to Caremark as proof.  **(See, Exhibit 11).**

## G.   **KICKBACKS FROM DEFENDANTS TO EMPLOYEES AND PATIENTS FOR REFERRALS**

250.    Defendants implemented several kickback schemes to obtain referrals and incentivize referrals with their own employees and through waiving patient's co-pays that government healthcare programs require to be collected.

251.    Brittney Cardinale, a Habana pharmacy technician, also received a kickback from Defendants from her husband's compound prescriptions being processed by Habana and/or Defendants.

252.    Defendants knowingly paid percentage based commissions to pharmacy technicians and pharmacy representatives employed by Defendants, some of whom held dual roles in these positions, for every patient referred to the pharmacy by that employee, including patient and prescriptions paid by government health care programs.

253.    As described in above paragraphs, when employing the scheme involving prescription splitting scheme, Defendants routinely and systematically waived co-pays for patients for the "compound prescription" that would accompany the larger dose of Diclofenac or Lidocaine that was provided to the patient separately.

254.    At the direction of Defendants, a pharmacy technician located at Longevity, LLC, along with Pharmacy Technician, Sean Francisco, knowingly conspired to refer friends and acquaintances to the Defendant pharmacies for processing of compound prescriptions. These prescriptions were being processed through and paid by the government health care program, Tricare, and were for an exorbitant retail amount that could exceed $10,000.00.

255.    After processing through Defendant, Longevity, LLC, the prescriptions would be processed through Defendant, HHP, where Relator was located.

256.    Upon noticing a delay in the processing of the prescriptions described above by pharm techs located at HHP with Relator, Relator learned from pharmacy technician, Brittney Cardinale, that the prescriptions were not to be given "priority" for filling because the prescriptions were just "thrown in the trash," never intended to be used by the patients, and served the exclusive purpose of "churning" fraudulent, government revenue for fake prescriptions.

257.    Relator also learned that pharmacy technician, Brittney Cardinale, was directed by Defendants not to invoice the compound prescriptions at issue being paid by Tricare and being processed by the Longevity, LLC pharmacy technician for her friends. Instead, Brittney Cardinale understood that the pharmacy technician at Longevity, LLC paid the co-pays for the prescriptions being processed for her friends, and no invoice needed to be sent. Further, the pharmacy technician would receive a percentage based commission calculated based off the price of the compound. Defendants maintained the patients credit cards on file. In order to process the prescriptions from her friends, the pharmacy technician automatically processed refills of the expensive prescriptions through Tricare the request of the patient or

the authorization from a licensed physician using the credit cards on file.  Relator became aware that these refills were routinely and systematically run monthly by Defendants.

258.   Relator became aware of physicians with whom Defendants maintained "relationships," such that the physicians were compliant in the altering of their original prescriptions.  **(See, Exhibit 8).**

259.   On several occasions, the PBMs flagged these expensive compound prescriptions for claim review and validation, an example of which is demonstrated by the attached evidence. *Id.*

260.   As discussed in above paragraphs, the pharm techs would receive percentage based commissions each time these prescriptions were processed through Defendant pharmacies.

### SCHEME BY DEFENDANT TO FRAUDENTLY REFER, PRESCRIBE AND PAY PATIENT

261.   Upon reasonable belief and knowledge, Relator states that at least one physician would routinely see and write clinically unnecessary prescriptions for select patients who were friends of a Longevity pharmacy technician. These prescriptions were processed and paid through Tricare, and when dispensed, they were discarded, and the commission payable to the technician associated with the prescription was shared with the patient.

### H.  PHYSICIAN REFERRALS AND REIMBURSEMENT

262.   Defendants knowingly compensated a physician, such as Dr. Raymond Wu, for Medicare and Medicaid referrals, in exchange for Defendants filling one personal prescription for Dr. Wu for free, at a value of several thousand dollars.  **(See, Exhibit 9).**

## I.   EFFORTS BY RELATOR BEATRIZ MORALES TO REFORM THE BUSINESS PRACTICES OF HABANA

263.   Relator attempted to circumvent the illegal practices of Defendants and pharm techs by bringing the illegality of the practice to the pharm techs' attention and to the attention of the owners, Steven Medendorp, Esq., Ryan Goodkin, and Terrance Myers; Goodkin and Myers were also licensed pharmacists.  **(See, Exhibit 17B and Exhibit 15).**

264.   Relator made several attempts on different occasions to speak with Defendant owners to explain and object to the practice of pharmacy technicians writing oral prescriptions taken from physicians, re-writing or re-formulating compound prescriptions after receipt from a physician, performing any task related to the filling and delivery of a prescriptions without the supervision of a licensed pharmacist. Additionally, on a daily basis, Relator prohibited pharmacy technicians and office personnel from performing any of the identified non-delegable tasks of pharmacist to the best of her ability, and attempted to implement restraints to what had been established as normal practice prior to her hiring by the Defendants, by educating owners and employees, supplying the aforementioned with appropriate state law and administrative guidance on the matter, and diligently monitoring the office staff around her to ensure no prescriptions were provided to patients without her supervision.

265.   To verify the pharmacy technicians understood the state regulations and laws, Relator would discuss the requirements and prohibited acts of pharmacist technicians. Relator required all pharmacy technicians under her to review and sign the Administrative Code 64B16-27.420, Pharmacy Technician – Delegable and Non-Delegable Tasks, including Brittany Cardinale, Omayra Diaz, and Erick Tamayo. **(See, Exhibit 16 and Exhibit 17B).** Relator would also inform Pharmacy Technicians on a regular basis that they cannot rewrite

prescriptions, that pharmacy technicians cannot take oral prescriptions, and that prescriptions cannot be changed after submission to a healthcare program.  **(See, Exhibit 16A, Exhibit 16B).**

266.     Additionally, the Relator objected to validating or checking any final prescriptions that were not written by a Pharmacist, as she came to recognize the handwriting of several pharm techs, including Brittney Cardinale and Omayra Diaz Garcia, who frequently, knowingly altered and forged prescriptions as described in this complaint.

267.     In attempts to correct the illegal procedures, Relator requested to be notified to write prescriptions prior to the processing of any prescriptions, however, Relator's instructions were not followed.  **(See, Exhibit 16B).**  Despite her request, pharm techs would not notify her of the necessary information until after a false claim was submitted and paid, and after the product was prepared for shipping.  **(See, Exhibit 16B).**

268.     To document the illegal behavior, Relator would notate the initials of the pharmacy technician that requested the Relator write a new prescription on the alleged original document, or if circumstances did not allow, on a telephone prescription, to then discontinue the original prescription and on the same, original document, Relator would note what Defendant had changed it to along with the initials of the Defendant employee who had requested the re-written prescription and the changed prescription number. **(See, Exhibit 7, Exhibit 2A and 2B).**

269.     Relator also attempted to frustrate the Defendant's practice of forging new prescriptions with the approved formulas by writing the "new" formula directly on the original prescription from a physician to document the changes and flag the changes to the PBMs. **(See, Exhibit 1B, Page 1).**  As described above, Defendants attempted to conceal their false

submissions and prescription forging by having pharm techs identify and submit a formula for payment that did not have a valid prescription. After which, a new prescription would be forged to match the formula submitted by the pharmacy technician and replace the original prescription. This was often followed by pharm techs submitting the newly, forged prescription for signature of the pharmacist in charge (although not required). However, once Relator made clear, as stated in the above paragraph, that she would not approve or write prescriptions after a submission had already been made, pharm techs avoided bringing this to her attention as frequently. However, Defendants would send correspondences to Relator requesting changes to prescriptions by providing prescription numbers and new formulas that required "new" prescriptions to be written as if they had not already been submitted. **(See, Exhibit 18).** Relator attempted to frustrate this scheme by writing the "new formula" directly on the original prescription to document the changes. However, Defendant employee, Faith Washington, instructed Relator to avoid doing this to prevent PBMs from auditing Defendant and recouping the Defendant's reimbursement. **(See, Exhibit 20).**

270.   In other instances, Relator took actions to attempt to prevent pharm techs and pharmacy employees from performing tasks that were only permitted to be performed by pharmacists and that put patient safety at risk. Relator realized that pharm techs were bypassing Drug Utilization Review (DUR) while reviewing prescriptions from notifications in the pharmacy computer program imprinting the pharmacy technician that bypassed DUR. Specifically, Relator noticed that Office Manager Rhonda Dykes was registered as a Pharmacy Technician in the pharmacy computer program when she was not a registered pharmacy technician or pharmacy technician in training, and she was bypassing the DUR on various occasions. Relator blocked Office Manager Dykes and contacted the pharmacy program company and

gave them examples of the error. However, after Defendant realized that Relator had blocked Office Manager Dyke, from the retail computer system the Defendant owners removed Relator's permissions and ability to correct unauthorized users in the pharmacy program.

271.   In addition, the Defendant failed to incorporate patient clinical profile and history information into the system, as required by code, thereby invalidating Defendant's eligibility to even participate in government health programs. See Fl. Stat. 465.0266 (b); Pharm Admin Code 64B16-27.1001, 64B16-27.210.

272.   Despite the Relator's objections to employees and management, at the insistence of the owners and office personnel, and through actions from the same to avoid and frustrate Relator's attempts to correct the behavior, the Defendant's illegal practices continued. **(See, Exhibit 21).**  Still, Relator contacted physicians and patients when altered prescriptions or formulas were observed. **(See, Exhibit 22).**   In some cases, the doctors had not even examined the patient, nor had any idea about the prescription being processed by the Defendants.  *Id*.  Relator also enlisted the assistance of compliant employees to assist in monitoring and deterring the illegal actions encouraged by the Defendant owners and employees.  For example, Relator received assistance from a trusted technician, Freddy Pagan, in double checking formulas to identify altered formulas by pharm techs that were clinically, pharmacologically and mathematically incorrect.  **(See, Exhibit 23).**   Lastly, Relator made disclosures to appropriate agencies regarding similar conduct.

<u>Redress Sought by Relator</u>

273.   This Complaint seeks redress for the scheme created by Defendants which resulted in its billing and receiving of funds from Medicare, Medicaid, and Tricare for compound

prescriptions that were not ordered by the patient's physician, not written by a licensed physician or pharmacist, were not compliant according to the US Pharmacopeia in a manner to attentive of patient safety, or that were resubmitted through PK under fictitious prescription numbers with altered formulas unverified by a physician or pharmacist without the physicians' knowledge to identify formulas the government health care programs would cover.  In some cases, physicians' signatures were forged, pharmacist initials and signatures were forged, prescription formulas were re-written by pharm techs, and oral prescriptions were written by pharm techs in violation of the law in the State of Florida.

274.    The Complaint also seeks redress for an additional approximately $ 17,000,000.00 in improper Medicare, Medicaid, and Tricare payments, consisting of payments to the Defendants whereby a company procedure was implemented such that prescriptions were automatically renewed annually for refills without a valid prescription from a physician or referencing prescriptions where no refills were authorized.

## VII.    CHARGES

### Count I: Presenting and Causing to Be Presented False and Fraudulent Claims in Violation of the False Claims Act, 31 U.S.C. §§ 3729(a)(1).

275.    The Defendants knowingly presented and/or caused to be presented, false claims to Medicare, Florida Medicaid, and Tricare for the payment of compound prescriptions through the use of altered and forged prescriptions

276.    Defendant owners, Ryan Goodkin and Terrence Myers, through in person interactions and communications, knowingly directed pharm techs to re-write original prescriptions, without knowledge or permission of a licensed physician or permission of a pharmacist as is

required by state law, and to submit the prescription under a false prescription number until a formula was identified that would be covered by the PBM of both government healthcare programs, Medicare Part D, Florida Medicaid, and Tricare.

277.    Defendants owner and non-pharmacist employees at the owners' direction knowingly re-wrote prescriptions, received from physicians for compound prescriptions for patients, rendering the prescriptions invalid, and re-formulated and re-wrote the prescriptions to include substances/compounds/ingredients that would render the prescription billable to Medicare and Tricare, when the original prescription as formulated would not qualified for coverage under the government healthcare program.

278.    Defendants owners and non-pharmacist employees at the owners' direction would create false prescription data after receipt of a written prescription received from a patient in person at the counter or via fax from the prescribing physician

279.    Defendants owner and non-pharmacist employees at the owners' direction re-wrote and reformulated prescriptions received from physicians for compound prescriptions for patients, rendering the prescriptions invalid, and re-formulated and re-wrote the prescriptions to include substances/compounds/ingredients that would render the prescription authorized for payment by Medicare Part D plans, Florida Medicaid, and Tricare when the original prescription as formulated would not qualify for coverage under the government healthcare program.

280.    When Defendants owners and non-pharmacist employees re-wrote prescriptions, "substitutions" would be determined by the non-pharmacist employees so that compounds/ingredients were included that would obtain a higher billable amount to Medicare and Tricare when the claim was submitted.

281.   When Defendants owners and non-pharmacist employees re-wrote prescriptions they would not receive approval from a licensed pharmacist or physician or the prescribing physician.

282.   Under regulations for Medicare Part D, all entities involved in providing Part D services must abide by state pharmacy laws.  42 C.F.R. § 423.505(i)(4)(iv) (requiring compliance with Federal laws, Regulations, and CMS instructions); 42 C.F.R. § 423.504(b)(iv)(A) (requiring compliance with applicable Federal and state standards); 42 C.F.R. § 423.153(c)(1) (Sponsors must represent that network providers are required to comply with state pharmacy standards).

283.   Additionally, pursuant to Section 1860D-2(e)(1)(A) of the Social Security Act, a "covered Part D drug" is defined as a drug that is "dispensed only upon prescription, and of "those drugs which are treated as prescribed drugs for purposes of section 1905(a)(12) [the Medicaid statute], a drug which may be dispensed only upon prescription." See also 42 C.F.R. 423.100.

284.   *A valid prescription* is defined as a prescription that complies with all applicable State law requirements constituting a valid prescription.  42 C.F.R. 423.100.

285.   In Florida, a valid written prescription for a medicinal drug is one that is issued by a health care practitioner licensed by law to prescribe such drug, is legibly printed or typed so as to be capable of being understood by the pharmacist filling the prescription; and contains the name of the prescribing practitioner, the name and strength of the drug prescribed, the quantity of the drug prescribed, and the directions for use of the drug.  Additionally, the written prescription must be dated and signed by the prescribing practitioner on the day when issued.  Fl. Stat. 456.42 (1).

286.   Thus, the claims submitted by the Defendants for compensation to under Medicare Part D and Tricare with altered or forged prescriptions were not valid prescriptions, and were false claims for payment.

287.   This is a claim for treble damages, civil penalties and attorneys' fees under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

288.   By means of the acts described above from at least August of 2015 through the present, Defendants knowingly presented or caused to be presented false and fraudulent Medicare Part D, Florida Medicaid, and Tricare claims for payment or approval in violation of the False Claims Act, 31 U.S.C. §§ 3729(a)(1).

289.   Defendants, by or through their agents, officers, or employees, knowingly presented or caused to be presented false and fraudulent Medicare, Florida Medicaid, and Tricare claims for payment or approval in violation of the False Claims Act, 31 U.S.C. §§ 3729(a)(1).

290.   Defendants directed pharm techs and/or office personnel, who were not licensed as pharmacists or physicians, to re-write controlled and non-controlled substances for which the re-written prescriptions, and thereby invalid prescriptions, accompanied claims for payment to government healthcare programs such as Medicare Part D, Florida Medicaid, and Tricare, which was not an allowable task for those technicians pursuant to state law and rendered the claim for payment false. (Exhibit 1).

291.   Defendants directed pharm techs and/or office personnel to re-write and re-formulate prescriptions from the physicians' original prescription to use and/or target products with high Average Wholesale Prices to drive up the cost recovered by requests for payment to government healthcare programs, specifically Tricare. Specifically, Defendant introduced

Bacitracin, which is an antibiotic, into compounds for which the inclusion of Bacitracin carried no indication of use, to drive up the cost of prescriptions. **(Exhibit 4).**

292. The United States, unaware of the falsity of the claims made by the Defendants, and in reliance on the material fraudulent or false representations within the claims, approved, paid, and participated in payments for claims that would otherwise not have been allowed or paid.

293. By reason of these payments, the United States has been damaged, and continues to be damaged, in an amount yet to be determined.

<u>**Count II – Conspiracy to Commit a Violation under (A), (B), and (G)**</u>
<u>**– in Violation of the False Claims Act,**</u>
<u>**31 U.S.C. §§3729(a)(1)(C)**</u>

294. Relator re-alleges and incorporates by reference paragraphs 1 through 274.

295. This is a claim for treble damages, civil penalties, and attorneys' fees under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

296. At all times relevant hereto, Defendants acted through their agents and employees and the acts of Defendants' agents and employees were within the scope of their agency and employment.

297. By means of the acts described above, Defendants knowingly conspired to defraud the United States by requesting or allowing false or fraudulent claims to be paid by the United States. Defendants attempted to defraud Medicare, Medicaid, and Tricare by illegally submitting their compound medications for approval outside the statutory guidelines.

298. The United States, unaware of the falsity of the claims made by the Defendants, and in reliance on the material fraudulent and false representations, approved, paid, and participated in payments for claims that would otherwise not have been allowed or paid.

299.   By virtue of the false and fraudulent claims made by Defendants, the United States has been damaged and continues to be damaged in substantial amounts.

### Count III - Causing and Making False and Fraudulent Claims, Records, and Statements to be Presented in Violation of the False Claims Act, 31 U.S.C. §§ 3729(a)(2).

300.   Relator re-alleges and incorporates by reference paragraphs 1 through 274.

301.   This is a claim for treble damages, civil penalties, and attorneys' fees under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

302.   At all times relevant hereto, Defendants acted through their agents and employees and the acts of Defendants' agents and employees were within the scope of their agency and employment.

303.   By means of the acts described above and from at least March 2014 through the present, Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States.

304.   The United States, unaware of the falsity of the claims made by the Defendants, and in reliance on the material fraudulent or false representations, approved, paid, and participated in payments for claims that would otherwise not have been allowed.

305.   By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

### Count IV: Defendants' Violation of the Anti-Kickback Statute Pursuant to 42 U.S.C. § 1320(a).

306.   Relator realleges and incorporates by reference paragraphs 1 through 274.

307.   This is an action pursuant to 42 U.S.C. § 1320(a).

308. By virtue of the activities described above, Defendants violated the federal Anti-Kickback Statute.

309. At all times relevant hereto, Defendants acted through their agents and employees and the acts of Defendants' agents and employees were within the scope of their agency and employment.

310. Defendants knowingly and willfully solicited, received, offered and paid remuneration, in return for either referrals of Medicare, Medicaid, and Tricare beneficiaries or the arranging, recommending, leasing or ordering of any item or service reimbursed by Medicare or Medicaid.

311. By virtue of this violation, the United States has been damaged, and continues to be damaged, in a substantial amount.

### Count V: Defendants' Violation of the Stark Law Pursuant to 42 U.S.C. §1395

312. Relator re-alleges and incorporates by reference paragraphs 1 through 274.

313. This is an action pursuant to 42 U.S.C. § 1395.

314. By virtue of the activities described above, Defendants violated the Stark Law.

315. Defendants knowingly and willfully submitted Medicare claims, Tricare claims, Medicaid claims, and another non-governmental medical claims that were the products of patient referrals from physicians with whom a government agency had an impermissible financial relationship.

316.    At all times relevant hereto, Defendants acted through their agents and employees and the acts of Defendants' agents and employees were within the scope of their agency and employment.

317.    Defendants' compensation arrangements and financial relationships with physicians in order to sell Defendants' compound medications were illegal.

318.    Defendants falsely submitted prescriptions that had not been written in order to change those prescriptions' formulas.

319.    By virtue of this violation, the United States has been damaged, and continues to be damaged, in a substantial amount.

## VIII.    <u>RELIEF</u>

### FIRST CAUSE OF ACTION

(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1) (claims from and after April 2015) and
31 U.S.C. § 3729(a)(1)(A) (claims from and after April 2015)
Defendant Habana Hospital Pharmacy

320.    The Relator repeats and realleges the preceding paragraphs 1 through 274 as if fully set forth herein.

321.    Defendants knowingly presented and caused to be presented false or fraudulent claims for payment or approval to the United States for compound prescriptions that were false or fraudulent because either (a) the services were not provided as billed, and/or (b) any services provided were not medically necessary, and/or (c) the records were altered to be acceptable and paid by Medicare.

322.     Defendants knowingly presented and caused to be presented false or fraudulent claims for payment or approval to the United States for home health care services that were false or fraudulent because they were induced by kickbacks.

323.     Defendants knowingly presented and caused to be presented false or fraudulent claims for payment or approval to the United States by submitting or causing to be submitted claims for home health care services that were ineligible for reimbursement under the Stark Law's express prohibition on Medicare, Medicaid, and Tricare billing and Medicare, Medicaid, and Tricare reimbursement for services that are the product of referral from a physician with whom the pharmacy has an illegal financial relationship.

324.     Defendants knowingly presented and caused to be presented false or fraudulent claims for payment or approval to the United States by submitting or causing to be submitted claims for certain claims under Medicare Part D that were ineligible for reimbursement under the Stark Law's express prohibition on Medicare billing and Medicare reimbursement for services that are the product of a referral that is tainted by an illegal financial relationship.

325.     By virtue of the false or fraudulent claims, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

### SECOND CAUSE OF ACTION

(False Claims Act: False Statements Material to False Claims)
(31 U.S.C. § 3729(a)(1)(B))

326.     The Relator repeats and realleges the preceding paragraphs 1 through and including 274 as if fully set forth herein.

327.     The Relator sues Defendant for violations of 31 U.S.C. § 3729(a)(1)(B)

328.   Defendant knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims to get claims for home health care paid by the United States.

329.   Defendant knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims with respect to home health care services that were ineligible for reimbursement as a result of illegal kickbacks.

330.   Defendant knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims and to get false or fraudulent claims paid by the United States with respect to claims for payment for prescriptions ineligible for reimbursement under the Stark Law's express prohibition on Medicare, Medicaid, and Tricare billing and Medicare, Medicaid, and Tricare reimbursement for services that are the product of unlawful kickback schemes.

331.   By virtue of the false or fraudulent statements that defendants made and/or caused to be made, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

## THIRD CAUSE OF ACTION
(Defendant Habana Hospital Pharmacy's Unjust Enrichment and
Constructive Trust)

332.   The Relators repeat and re-allege the preceding paragraphs 1 through 274 as if fully set forth herein.

333.   The Relators claim the recovery of all monies by which Defendants have been unjustly enriched, and a constructive trust has arisen on these amounts for the benefit of the United States.

334.   As a consequence of the acts set forth above, Defendants were unjustly enriched at the expense of the United States in an amount to be determined at trial, which, under the circumstances, in equity and good conscience, should be returned to the United States.

## FOURTH CAUSE OF ACTION
(Defendant Habana Hospital Pharmacy's Receipt of Payment by
Mistake)

335.   The Relators repeat and re-allege the preceding paragraphs 1 through 274 as if fully set forth herein.

336.   The Relators claim the recovery of all monies Medicare, Medicaid, and Tricare paid to Defendants by mistake.

337.   As a consequence of the acts set forth above, Defendants were paid by mistake at the expense of the United States in an amount to be determined at trial, which should be returned to the United States.

## FIFTH CAUSE OF ACTION
(Retaliation/Discrimination of Relator against Defendant Habana
Hospital Pharmacy, Pursuant to 31 U.S.C. § 3729 and Florida
Statutes § 68.081-68.089 Florida Whistleblower Protection Act
Florida Statue 448.102)

338.   Relator realleges and incorporates by reference paragraphs 1 through 274.

339.   This is an action pursuant to 31 U.S.C. § 3729 *et. seq.* and Florida Statutes § 68.081 *et. seq.*

340.    Relator actions in bringing the truth about the company's fraud to her superior's attention caused a hostile environment that led to constructive discharge.

341.    By virtue of the activities described above, Relator has engaged in conduct protected under the Federal False Claims Act, the Florida False Claims Act, and the Florida Whistleblower Protection Act.

342.    Defendants were aware of Relator's actions.

## IX.    PRAYER FOR RELIEF

WHEREFORE, the Relator demands and prays that judgment be entered in favor of the United States against Defendants Habana as follows:

I.    On the First Count as to all Defendants under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with reasonable attorney's fees and costs and all such further relief as may be just and proper.

II.    On the Second Count as to all Defendants under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with reasonable attorney's fees and costs and all such further relief as may be just and proper.

III.    On the Third Count as to Defendants for unjust enrichment, for the amounts by which defendants were unjustly enriched, plus interest, costs, expenses, reasonable attorney's fees and costs and for all such further relief as may be just and proper.

IV.   On the Fourth Count as to Defendants for payment by mistake, for the amounts the United States paid by mistake, plus interest, costs, expenses, reasonable attorney's fees and costs and for all such further relief as may be just and proper.

V.   On the Fifth Count as to Defendants for retaliation/discrimination against Relator for the amounts by which defendants were unjustly enriched, plus interest, costs, expenses, reasonable attorney's fees and costs and for all such further relief as may be just and proper.

Respectfully Submitted,

Natalie Khawam, Esq., MBA, MS
FBN: 027997
nataliek@813whistle.com
WHISTLEBLOWER LAW FIRM, P.A.
400 N. Tampa Street, Suite 950
Tampa, FL 33602-4700
(813) 944-7853 Office
(813) 813 434-2173 Fax
Attorney for Relator

/s/ Jay Wolfson

Jay Wolfson, Esq.
FBN: 4375
hlthlawyer@gmail.com
P.O. Box 342548
Tampa, Florida 33694
813-265-2250
Co-Counsel for Relator

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Memorandum of Law Pursuant to 31 U.S.C. § 3730(e)(4)(b) and 3730(b)(2) Disclosing Material Evidence Supporting False Claims Act Complaint Against Habana Hospital Pharmacy, Inc., has been furnished on July 18, 2017 on the Service List below.

Natalie Khawam, Esq., FBN: 027997
nataliek@813whistle.com
WHISTLEBLOWER LAW FIRM, P.A.
400 N. Tampa Street, Suite 950
Tampa, FL 33602-4700
(813) 944-7853 Office
(813) 813 434-2173 Fax
Attorney for Relator

/s/ Jay Wolfson
Jay Wolfson, Esq., FBN 4375
hlthlawyer@gmail.com
P.O. Box 342548
Tampa, Florida 33694
813-265-2250
Co-Counsel for Relator

## SERVICE LIST

Service by *Certified Mail, Return Receipt Requested* to:

Benjamin G. Greenberg
Acting United States Attorney
United States Attorney's Office
99 N.E. 4th Street
Miami, Fl. 33132

Jeff Sessions
United States Attorney General
Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-001

Pam Bondi
Attorney General, State of Florida
Office of Attorney General
The Capitol PL 01
Tallahassee, FL 32399

Jeff Atwater
CFO, State of Florida
200 E. Gaines Street
Tallahassee, FL 32399

Civil Process Clerk
101 South U.S. Highway 1
Rm #1016
Ft. Pierce, FL 34950